1  Thomas N. Millikan, Bar No. 234430
   TMillikan@perkinscoie.com
2  Joseph P. Reid, Bar No. 211082
   JReid@perkinscoie.com
3  PERKINS COIE LLP
   11452 El Camino Real, Suite 300
4  San Diego, CA  92130-2080
   Telephone:  858.720.5700
5  Facsimile:  858.720.5799

6  Andrew N. Klein, Bar No. 300221
   AKlein@perkinscoie.com
7  PERKINS COIE LLP
   3150 Porter Drive
8  Palo Alto, CA  94304-1212
   Telephone:  650.838.4300
9  Facsimile:  650.838.4350

10 *Attorneys for Plaintiff*
   Netskope, Inc.

11

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14

15 NETSKOPE, INC.,                    Case No.   3:25-cv-2360

16                Plaintiff,          **COMPLAINT FOR PATENT
                                      INFRINGEMENT**
17        v.
                                      **JURY TRIAL DEMANDED**
18 FORTINET, INC.,

19                Defendant.

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PATENT
INFRINGEMENT

Plaintiff Netskope, Inc. ("Plaintiff" or "Netskope") brings this action for patent infringement alleging that Defendant Fortinet, Inc. "Fortinet") infringes U.S. Patent Nos. 8,356,336 (the "'336 Patent"), 8,543,710 (the "'710 Patent"), 8,117,639 (the "'639 Patent"), 8,224,983 (the "'983 Patent"), 8,327,426 (the "'426 Patent"), 7,593,936 (the "'936 Patent"), 8,397,282 (the "'282 Patent"), 8,661,153 (the "'153 Patent"), and 8,635,697 (the "'697 Patent") (collectively "Netskope's Patents"). In support of this action, Netskope, by and through its attorneys, alleges as follows:

## **BACKGROUND**

**I.      Fortinet Repeatedly Bullied Netskope with Threats of Patent Infringement, Forcing Netskope to Defend Itself.**

1.      Because of Fortinet's repeated threats of litigation and steadfast refusal to provide support for its accusations of patent infringement, Netskope had no viable alternative but to bring a declaratory judgment action in this district. *See Netskope, Inc. v. Fortinet, Inc.*, NDCA-3-22-cv-01852 ("Netskope's Declaratory Judgement Action").

2.      For months, Fortinet repeatedly threatened to sue Netskope for patent infringement. During that time, Netskope repeatedly requested the basis for Fortinet's threats and support for its exorbitant settlement demands. At every turn, Fortinet flatly refused Netskope's requests for this basic information.

3.      Specifically, Fortinet was unwilling to identify the individual patent claims it thinks Netskope infringes, the specific Netskope products it believes are infringing, or to provide infringement charts illustrating its infringement allegations.

4.      Similarly, Fortinet refused to provide any evidence or calculations to support its demand for $100 million in damages.

5.      Despite Fortinet's bad-faith negotiation techniques and unreasonable financial demands, Netskope tried for months to find common ground for a reasonable business resolution. Taken together, Netskope made at least four overtures to Fortinet attempting to conduct a good-faith dialogue, yet those efforts were met with nothing but silence and stonewalling.

6.      As it became clearer that Fortinet's negotiations were merely a pretext to bully Netskope—as Fortinet did to other companies in the past—Netskope realized it had no choice remaining but to bring a lawsuit to protect its customers, company, and investors.  Accordingly, on March 24, 2022, Netskope filed a complaint seeking a declaratory judgment that it did not infringe the patents Fortinet had threatened it with.

7.      During Netskope's Declaratory Judgement Action, Netskope discovered that Fortinet infringed several of Netskope's Patents.  Netskope filed a motion to supplement its declaratory judgement complaint to add claims for Fortinet's infringement of Netskope's Patents.

8.      On February 3, 2025, the Court denied Netskope's Motion to Supplement.

9.      With no other option, Netskope now files this separate complaint against Fortinet for infringing Netskope's Patents.

## II.    Netskope's Innovation in Cloud Security Has Made It a Market Leader Since 2012.

10.     Netskope has been an innovator in cloud-security services since the company's inception in 2012.

11.     While conventional network security devices (e.g., firewalls) existed at that time, those devices had become antiquated and were ill-suited as more applications and services moved to the cloud.

12.     Recognizing this growing and unfulfilled market, Netskope worked to develop a comprehensive, homegrown computer security platform that would help businesses manage and secure their applications and data in the cloud.

13.     Netskope successfully released its first product in 2013 and has continued to innovate ever since.  Today, Netskope's homegrown security platform offers a vast range of innovative cloud security, networking and analytics solutions.

14.     As part of its cloud-security platform, Netskope offers services that include behavior analytics and data loss prevention (DLP) functionality.

15.     Netskope's cloud-based behavior analytics service monitors and tracks user activity across cloud applications, services, and websites.  Netskope's behavior analytics service provides companies with a helpful tool to detect and flag certain user behavior.

16.    As another part of its innovative platform, Netskope offers cloud-based DLP services.  Those services help companies protect confidential information from loss, exfiltration, and inadvertent public disclosure by identifying documents that contain confidential information and handling them according to defined policies.

17.    While other companies have started offering cloud-security services, Netskope differentiates itself by offering a proven security platform that is data-centric, cloud-smart, and fast.

18.    Because Netskope's products are visionary and high-quality, many innovative and prominent companies, including Fortune 500 companies in multiple market verticals, use them. Netskope's behavior analytics and DLP services are currently offered to and used by customers who reside in the United States, including in this Judicial District.

19.    The industry has praised Netskope and its visionary products for their excellence. For example, Netskope has been recognized by Forbes on its list of the top 100 private cloud companies and Gartner in its Magic Quadrant reports.

20.    At the product level, the industry has praised Netskope's industry-leading work in behavior analytics and data loss prevention.  For example:

a.    Business Intelligence Group recognized Netskope in the Data Protection—Enterprise category for the 2020 Fortress Cyber Security Awards;

b.    Cyber Defense Magazine named Netskope a winner of two 2020 InfoSec Awards, including a win in the category of Data Loss Prevention;

c.    The Cybersecurity Excellence Award was awarded to Netskope in the Data Leakage Prevention category;

d.    Security Products selected Netskope's Cloud DLP services as the Product of the Year; and

e.    CRN selected Netskope's Threat Protection Services as the Overall Winner for Product of the Year.

COMPLAINT FOR PATENT INFRINGEMENT

-3-

**III.    Fortinet Is a Market Follower That Attempts to Buy Its Way into New Markets, Including Cloud Security.**

21.    While Netskope innovated its way into being a leader in cloud security, Fortinet has tried to buy its way into cloud security after its firewall business began to fail.

22.    Founded in 2000, Fortinet started in the now-antiquated field of physical firewalls. By 2010, Fortinet faced headwinds due to waning demand for its products and services and increased competition, among other things.[1]

23.    Fortinet also faced grave financial issues with its history of losses, potential inability to maintain its short-term profitability, and threats to revenue growth.[2]

24.    Fortinet explained that its trailing market position was due, in part, to a "network security market [that] [was] rapidly evolving."

25.    Fortinet warned that "[i]f it [did] not quickly respond to the rapidly changing and rigorous needs of [its] end-customers by developing and releasing and making available on a timely basis new products and services or enhancements that [could] respond adequately to new security threats, [its] competitive position and business prospects [would] be harmed."[3]

26.    To do so, Fortinet decided to "acquire additional businesses, products, or technologies and intellectual property, such as patents," to improve its trailing market position.[4]  In other words, Fortinet planned to buy the innovations of others to remain competitive.

---

[1] Fortinet, Inc., Ann. Rep. (Form 10-K) (Mar. 5, 2010), 18 (available at https://investor.fortinet.com/node/13891/html) (last visited Feb. 7, 2022).
[2] *Id.*
[3] *Id.* at 33.
[4] *Id.* at 32.

COMPLAINT FOR PATENT                        -4-
INFRINGEMENT

27.     By all accounts, that is exactly what Fortinet did.  Since 2010, Fortinet has acquired the innovations of at least thirteen companies, six of which were in cloud security: ZoneFox[5], enSilo[6], OPAQ[7], Panopta[8], ShieldX[9], and CyberSponse.[10]

28.     While Fortinet hoped its spending spree would vault it to the top of the cloud-security market, that has not occurred.

29.     Fortinet's cloud application security broker (CASB) product is an example of its inability to buy its way to the top.

30.     Fortinet first launched its CASB in 2017, several years after many leading innovators in the industry, including Netskope.[11]

31.     In addition to being late to market, Fortinet's CASB product lacked important features important to a well-performing CASB.

32.     Unlike its competitors in the CASB market, Fortinet did not have a Zero Trust Network Access (ZTNA) cloud solution.

---

[5] Michael Novinson, *Fortinet Buys Threat Analytics Startup ZoneFox To Fight Insider Threats*, THE CHANNEL COMPANY (Oct. 23, 2018), https://www.crn.com/news/security/fortinet-buys-threat-analytics-startup-zonefox-to-fight-insider-threats; Fortinet, *Fortinet Acquires ZoneFox* (Oct. 23, 2018), https://www.fortinet.com/blog/business-and-technology/fortinet-acquires-zonefox.

[6] Charlie Osborne, *Fortinet acquires enSilo in endpoint security portfolio push*, ZDNET (Oct. 29, 2019), https://www.zdnet.com/article/fortinet-acquires-ensilo-in-endpoint-security-portfolio-push/; Michael Novinson, *Fortinet Buys Cybersecurity Startup enSilo To Boost Endpoint Defenses*, THE CHANNEL COMPANY (Oct. 28, 2019), https://www.crn.com/news/security/fortinet-buys-cybersecurity-startup-ensilo-to-boost-endpoint-defenses.

[7] NetSec Editor, *Fortinet Acquires Cloud Security Startup Opaq*, NETSEC.NEWS (Jul. 21, 2020), https://www.netsec.news/fortinet-acquires-cloud-security-startup-opaq/.

[8] Joe Panettieri, *Fortinet Acquires Panopta; MSSP Partners Gain Cybersecurity Network Monitoring*, MSSP ALERT (Dec. 8, 2020), https://www.msspalert.com/investments/fortinet-acquires-panopta/.

[9] Michael Novinson, *Fortinet Acquires Cloud And Network Security Startup ShieldX*, THE CHANNEL COMPANY (Mar. 20, 2021), https://www.crn.com/news/security/fortinet-acquires-cloud-and-network-security-startup-shieldx.

[10] Joe Panettieri, *Fortinet Acquires SOAR Provider CyberSponse: CEO Explains MSSP Partner Benefits*, MSSP ALERT (Dec. 12, 2019), https://www.msspalert.com/investments/fortinet-buys-cybersponse/.

[11] *See* Jessica Lyons Hardcastle, *Fortinet Buys Opaq, Claims First Complete SASE Stack*, SDXCENTRAL (July 21, 2020), https://www.sdxcentral.com/articles/news/fortinet-buys-opaq-claims-first-complete-sase-stack/2020/07/.

33.    Rather than developing a ZTNA cloud solution internally, Fortinet acquired OPAQ and its ZTNA cloud solution to enhance Fortinet's existing Secure Access Service Edge cloud-security platform.

34.    But even after buying the innovations of OPAQ, Fortinet's CASB product did not rise to the top of the market.  In Gartner's October 2020 Magic Quadrant for CASBs (shown below), Fortinet is not even mentioned:



35.    Netskope, on the other hand, is identified as a market leader.

36.    Fortinet is a market follower in other areas.  For example, Fortinet is not mentioned in Gartner's February 2022 Magic Quadrant for Security Service Edge (shown below).



Figure 1: Magic Quadrant for Security Service Edge

Source: Gartner (February 2022)

37.    Netskope is again identified as a market leader.

38.    In addition to products, Fortinet also buys other companies' patents.  As of December 31, 2009, for example, Fortinet had only 40 issued patents in its portfolio.[12]  Even at that point, Fortinet publicly conceded that it "purchased most of [its] issued U.S. patents and many of [its] pending U.S. patent applications from other entities."[13]

IV.    **When Buying its Way into Cloud Security Failed, Fortinet Turned to Bullying.**

39.    After buying its way into a new market, Fortinet transitions to displacing incumbent market innovators through bullying and aggression.  Specifically, using its size, imposing patent

---

[12] Fortinet, Inc., Ann. Rep. (Form 10-K) (Mar. 5, 2010), 14 (available at https://investor.fortinet.com/node/13891/html) (last visited Feb. 7, 2022).
[13] *Id.*

portfolio, and threats of litigation, Fortinet tries to bully smaller market innovators into paying an exorbitant royalty for a license to Fortinet's patent portfolio. If innovators resist, Fortinet sues them to force compliance.

40.    Fortinet has used this strategy before, most recently in its litigation with Forescout.[14]

41.    As Forescout has explained,[15] less than one month before Fortinet first contacted Forescout, Forescout publicly announced a major acquisition that would have helped its position in the market.[16]

42.    Realizing the potential leverage it could gain by threatening the acquisition, Fortinet sent Forescout a letter accusing it of patent infringement and demanding that it license Fortinet's patent portfolio.[17]

43.    In response, Forescout asked for more information to assess Fortinet's claim, including an identification of the allegedly infringed patents. But, rather than engage Forescout in good faith, Fortinet deployed a series of strategic maneuvers to increase its leverage over Forescout.

44.    To begin, Fortinet refused to identify the specific patents Forescout allegedly infringed or provide any evidence of infringement.[18] Rather, Fortinet justified its licensing demand by referencing Forescout's "well-capitalized acquirer."[19] This information asymmetry deprived Forescout of any ability to assess Fortinet's infringement allegation.

45.    Next, Fortinet initiated strategic litigation against Forescout. One business day before Forescout was set to close its acquisition, Fortinet sued Forescout for infringing three patents Fortinet had never identified to Forescout.[20] Fortinet's complaint contained express reference to Forescout being acquired.[21]

---

[14] *Fortinet, Inc. v. Forescout Technologies, Inc.*, No. 3:20-cv-03343 (N.D. Cal. May 15, 2020).
[15] Answer to Am. Compl., and Countercl. against Pl. Fortinet, Inc., ¶ 137, *Fortinet, Inc. v. Forescout Technologies, Inc.*, No. 3:20-cv-03343, Dkt. No. 107 (N.D. Cal. July 6, 2021).
[16] *Id.* at ¶¶ 135-136.
[17] *Id.* at ¶ 137.
[18] *Id.*
[19] *Id.*
[20] *Id.* at ¶ 138, 141.
[21] *Id.* at ¶ 139.

46.    At the same time, Fortinet engaged in an aggressive, concerted public relations campaign.  For example, Fortinet admits providing negative press statements to news outlets in order to disparage Forescout's reputation.[22]

47.    Fortinet also likely told Forescout's customers that Forescout's financial solvency was in doubt.  For example, Fortinet circulated a sample email that could be sent to customers considering Forescout that exposed Forescout's supposed financial woes.

48.    Fortinet's bullying strategy apparently worked.  Immediately after Fortinet sued Forescout and smeared it in the press, Forescout's acquirer, Advent, announced it would no longer proceed with the acquisition.[23]  And while Advent eventually acquired Forescout, it did so on terms much less favorable to Forescout.[24]

49.    In addition, potential and existing Forescout customers turned away from Forescout because of Fortinet's calculated maneuvers.[25]

**V.    Fortinet Is Attempting to Deploy the Same Bullying Strategy Against Netskope.**

50.    Fortinet's approach with Netskope follows the pattern of behavior Fortinet displayed in the Forescout litigation.

51.    On October 22, 2021, Fortinet sent Netskope a letter accusing Netskope of infringing three Fortinet patents: U.S. Patent Nos. 10,237,282; 9,225,734; and 11,032,301.

52.    Fortinet's October 22, 2021 letter demanded that Netskope pay for a license to Fortinet's entire patent portfolio.

53.    Fortinet's October 22, 2021 letter claimed that an unidentified "competitor [had] paid Fortinet nine figures for a limited term license" to its patent portfolio.[26]

---

[22] Resp. re 107 Answer to Am. Compl., Countercl., Answer, Affirmative Defenses, and Countercls., ¶ 142, *Fortinet, Inc. v. Forescout Technologies, Inc.*, No. 3:20-cv-03343, Dkt. No. 135 (N.D. Cal. Dec. 13, 2022).
[23] Answer to Am. Compl. and Countercl. against Pl. Fortinet, Inc., ¶ 144, *Fortinet, Inc. v. Forescout Technologies, Inc.*, No. 3:20-cv-03343, Dkt. No. 107 (N.D. Cal. July 6, 2021).
[24] *Id.* at ¶ 146.
[25] *Id.*
[26] The letter also contained irrelevant and incorrect allegations about employees leaving Fortinet to work for Netskope that Fortinet has since abandoned.

COMPLAINT FOR PATENT INFRINGEMENT       -9-

54.     Fortinet's October 22, 2021 letter did not identify the patent claims that Fortinet contended were infringed.

55.     Fortinet's October 22, 2021 letter did not identify any allegedly infringing Netskope products.

56.     After the initial letter, the parties had a call on December 13, 2021.

57.     During the December 13, 2021 call, Netskope indicated that Fortinet had not provided information to allow Netskope to assess Fortinet's infringement allegations.

58.     During the December 13, 2021 call, Netskope asked if Fortinet could provide information to help the assessment, such as allegedly infringing products or a claims chart detailing allegations.

59.     During the December 13, 2021 call, Netskope asked Fortinet for the quantitative basis for its financial demands.

60.     During the December 13, 2021 call, Fortinet did not identify the claims it contended Netskope infringed.

61.     During the December 13, 2021 call, Fortinet did not to identify the Netskope products it contended infringed.

62.     During the December 13, 2021 call, Fortinet did not to provide a claim chart.

63.     During the December 13, 2021 call, Fortinet did not provide any quantitative basis for its financial demands.

64.     Instead, during the December 13, 2021 call, Fortinet reiterated its licensing demand for the entire Fortinet portfolio at a fee of $100,000,000.

65.     Fortinet wrote Netskope on December 16, 2021.

66.     Fortinet's December 16, 2021 email claimed it was "under pressure to settle or initiate a lawsuit … if Netskope [didn't] reach final agreement soon to settle..."

67.     Fortinet's December 16, 2021 email did not identify the patent claims that Fortinet contended were infringed.

68.     Fortinet's December 16, 2021 email did not identify any allegedly infringing Netskope products.

1         69.     Fortinet's December 16, 2021 email did not provide a claim chart.

2         70.     Fortinet's December 16, 2021 email did not provide any quantitative basis for its

3  financial demands.

4         71.     Netskope responded on December 17, 2021.

5         72.     Netskope's December 17, 2021 email stated that Fortinet had only reiterated its

6  demand for a $100 million payment without providing any evidence of infringement.

7         73.     Netskope's December 17, 2021 email made clear that Netskope respects Fortinet's

8  intellectual property rights and was willing to pay what is appropriate.

9         74.     Netskope's December 17, 2021 email stated that Netskope was not aware of any

10  infringement.

11        75.     Netskope's December 17, 2021 email stated that none of the three patents identified

12  by Fortinet appeared relevant to Netskope.

13        76.     Netskope's December 17, 2021 email offered to create a process to assess what

14  relevance, if any, Fortinet's patent portfolio had to Netskope's products.

15        77.     Fortinet responded on December 23, 2021.

16        78.     Fortinet's December 23, 2021 email did not identify the patent claims that Fortinet

17  contended were infringed.

18        79.     Fortinet's December 23, 2021 email did not identify any allegedly infringing

19  Netskope products.

20        80.     Fortinet's December 23, 2021 email did not provide a claim chart.

21        81.     Fortinet's December 23, 2021 email did not provide any quantitative basis for

22  Fortinet's financial demands.

23        82.     Rather, Fortinet merely responded: "Please let us know when we can expect a

24  specific response."

25        83.     Fortinet emailed Netskope again on January 20, 2022.

26        84.     Fortinet's January 20, 2022 email threatened Netskope with litigation.

27

28

85.    Fortinet's January 20, 2022 email demanded that by January 24 at 5 p.m. Pacific, Netskope tell Fortinet whether Netskope would pay Fortinet $100,000,000 for a limited term license to Fortinet's portfolio.

86.    Fortinet's January 20, 2022 email threatened to initiate litigation if Fortinet did not receive a response from Netskope by its January 24 deadline.

87.    Fortinet's January 20, 2022 email attached a draft complaint accusing Netskope of patent infringement.

88.    Neither Fortinet's January 20, 2022 email nor its draft complaint identified the patent claims that Fortinet contended were infringed.

89.    Neither Fortinet's January 20, 2022 email nor its draft complaint identified any allegedly infringing Netskope products.

90.    Neither Fortinet's January 20, 2022 email nor its draft complaint provided a claim chart.

91.    Neither Fortinet's January 20, 2022 email nor its draft complaint provide any quantitative basis for Fortinet's financial demands.

92.    Fortinet's January 20, 2022 draft complaint did not identify the patents Fortinet contended were infringed.

93.    Fortinet's January 20, 2022 draft complaint left placeholders for the allegedly infringed patents and infringing Netskope products.

94.    Netskope responded on January 21, 2022.

95.    Netskope's January 21, 2022 email reiterated Netskope's commitment to respecting Fortinet's intellectual property and paying a royalty, if appropriate.

96.    Netskope's January 21, 2022 email reiterated that it was not aware of any infringement by Netskope and that Fortinet had not offered any evidence of infringement.

97.    Netskope's January 21, 2022 email noted that Fortinet had continued to deprive Netskope of basic information to assess Fortinet's infringement accusation.

98.    Netskope's January 21, 2022 email again asked for an identification of the patents Fortinet believed Netskope was infringing.

99.    Netskope's January 21, 2022 email again asked for the claims of each patent Fortinet believed Netskope was infringing.

100.    Netskope's January 21, 2022 email again asked for an identification of the allegedly infringing Netskope products.

101.    Netskope's January 21, 2022 email again asked for claim charts.

102.    Netskope's January 21, 2022 email reiterated its commitment to a business resolution.

103.    Netskope's January 21, 2022 email proposed a business resolution in which Netskope would consider licensing a subset of Fortinet's portfolio at an adjusted royalty rate.

104.    Fortinet responded by email on January 21, 2022.

105.    Fortinet's January 21, 2022 email rejected the specifics of Netskope's business resolution.

106.    Fortinet's January 21, 2022 email provided no counteroffer.

107.    Fortinet's January 21, 2022 email threatened that Fortinet had even more patents it could assert against Netskope, but did not identify those additional patents.

108.    Fortinet's January 21, 2022 email did not identify the patent claims that Fortinet contended were infringed.

109.    Fortinet's January 21, 2022 email did not identify any allegedly infringing Netskope products.

110.    Fortinet's January 21, 2022 email did not provide a claim chart.

111.    Fortinet's January 21, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

112.    Netskope responded on February 7, 2022.

113.    Netskope's February 7, 2022 email reiterated Netskope's commitment to licensing any patents Netskope infringed based on an objective valuation of the patents.

114.    Netskope's February 7, 2022 email also reiterated that Fortinet had not provided a list of all the patents it contends Netskope infringes, the Netskope products it thinks are infringing for each patent, and how much Fortinet believes a non-exclusive license to each patent to be worth.

115.    Netskope's February 7, 2022 email made a simple request for a link to a web page identifying the allegedly infringing product(s).

116.    Netskope's February 7, 2022 email reiterated Netskope's commitment to a sensible business resolution.

117.    Fortinet responded on February 7, 2022.

118.    Fortinet's February 7, 2022 email claimed that Fortinet had given Netskope "a fair amount of information."

119.    Fortinet's February 7, 2022 email claimed that the information Netskope needed was "publicly available."

120.    Fortinet's February 7, 2022 email accused Netskope of infringing three more patents (U.S. Patent Nos. 10,826,941; 8,793,151; 9,197,601) and claimed there were more.

121.    Fortinet's February 7, 2022 email did not identify the patent claims from these three patents that Fortinet contended were infringed.

122.    Fortinet's February 7, 2022 email did not identify any Netskope products that allegedly infringe these three patents.

123.    Fortinet's February 7, 2022 email did not provide any links to a web page identifying the allegedly infringing Netskope products.

124.    Fortinet's February 7, 2022 email did not provide a claim chart.

125.    Fortinet's February 7, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

126.    Fortinet's February 7, 2022 email claimed that Netskope had "full knowledge of infringement" even though Fortinet had not identified an infringing product or allegedly infringed claim.

127.    Netskope responded on February 24, 2022.

128.    Netskope's February 24, 2022 email reiterated that Fortinet had not provided support for its infringement accusation.

129.    Netskope's February 24, 2022 email reiterated that Fortinet had not provided any claim charts.

130.    Netskope's February 24, 2022 email reiterated that Fortinet had not identified the allegedly infringed claims.

131.    Netskope's February 24, 2022 email reiterated that Fortinet had not identified the allegedly infringing Netskope products.

132.    Netskope's February 24, 2022 email reiterated that Fortinet had not provided any quantitative basis for its financial demands.

133.    Netskope's February 24, 2022 email claimed that Fortinet had not provided a settlement demand for licensing a subset of its patents.

134.    Netskope's February 24, 2022 email reiterated that Netskope was open to a reasonable business solution.

135.    Fortinet responded on February 28, 2022.

136.    In its February 28, 2022 email, Fortinet agreed to have a call with Netskope and asked who from Netskope would attend.

137.    Fortinet's February 28, 2022 email did not identify the patent claims Fortinet contended were infringed.

138.    Fortinet's February 28, 2022 email did not identify any Netskope products that allegedly infringed Fortinet's patents.

139.    Fortinet's February 28, 2022 email did not provide a claim chart.

140.    Fortinet's February 28, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

141.    On March 1, 2022, Netskope responded with who would attend the call from Netskope.

142.    Fortinet responded on March 9, 2022.

143.    Fortinet's March 9, 2022 email claimed that Fortinet had "provided Netskope with more than sufficient relevant information – including six Fortinet patents and a draft complaint – over many months now.  So [it] [would] limit the agenda to the reasonable business resolution … – i.e., the appropriate royalty for Netskope to pay Fortinet for a license to some or all of Fortinet's patents."

144.    Fortinet's March 9, 2022 email did not identify the patent claims Fortinet contended were infringed.

145.    Fortinet's March 9, 2022 email did not identify any Netskope products that allegedly infringed Fortinet's patents.

146.    Fortinet's March 9, 2022 email did not provide a claim chart.

147.    Fortinet's March 9, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

148.    Netskope responded on March 11, 2022.

149.    Netskope's March 11, 2022 email reiterated that Fortinet had not provided specifics about its infringement allegations.

150.    Netskope's March 11, 2022 email reiterated its commitment to discuss a reasonable business resolution.

151.    Fortinet responded on March 11, 2022.

152.    Fortinet's March 11, 2022 email stated that it wanted to have a preliminary call to discuss the agenda for the call.

153.    Fortinet's March 11, 2022 email claimed that Fortinet had provided "ample information including a draft complaint and a number of examples of specific patents infringed."

154.    Fortinet's March 11, 2022 email claimed that Fortinet's "entire patent portfolio is public and Netskope and its outside counsel have had access to [Fortinet's] entire patent portfolio for a long time and have been on notice of [Fortinet's] detailed claims for months now."

155.    Fortinet's March 11, 2022 email asked if Netskope would provide any remaining specific questions Netskope had.

156.    Fortinet's March 11, 2022 email did not identify the patent claims Fortinet contended were infringed.

157.    Fortinet's March 11, 2022 email did not identify any Netskope products that allegedly infringed Fortinet's patents.

158.    Fortinet's March 11, 2022 email did not provide a claim chart.

159.    Fortinet's March 11, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

160.    Netskope responded on March 14, 2022.

161.    Netskope's March 14, 2022 email reiterated that Netskope was open to a license to any valid patents Netskope is using based on an objective valuation of the patents.

162.    Netskope's March 14, 2022 email reiterated that Fortinet's demand has only been $100,000,000 for a limited term license to Fortinet's entire portfolio.

163.    Netskope's March 14, 2022 email reiterated that Fortinet had not provided any objective evidence of infringement or license valuation.

164.    Netskope's March 14, 2022 email asked to understand licensing models and valuation of non-exclusive licenses that Fortinet might accept so Netskope can provide a reasonable counteroffer.

165.    Netskope's March 14, 2022 email reiterated its commitment to work towards a business resolution.

166.    Fortinet responded on March 14, 2022.

167.    Fortinet's March 14, 2022 email asked if Netskope needed anything in advance of the call to make a specific proposal.

168.    Fortinet's March 14, 2022 email did not identify the patent claims Fortinet contended were infringed.

169.    Fortinet's March 14, 2022 email did not identify any Netskope products that allegedly infringed Fortinet's patents.

170.    Fortinet's March 14, 2022 email did not provide a claim chart.

171.    Fortinet's March 14, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

172.    On March 21, 2022, the parties had a call.

173.    During the March 21, 2022 call, Fortinet asked for Netskope's revenue.

COMPLAINT FOR PATENT INFRINGEMENT                    -17-

174. During the March 21, 2022 call, Fortinet expressed its intention to provide a formula into which Netskope's revenue could be input to calculate what Fortinet believed was an appropriate royalty.

175. During the March 21, 2022 call, Netskope indicated its assumption that the competitor who had paid Fortinet nine figures for a limited term license was Palo Alto Networks.

176. During the March 21, 2022 call, Fortinet did not deny that the competitor who had paid Fortinet nine figures for a limited term license was Palo Alto Networks.

177. During the March 21, 2022 call, Netskope proposed different ways to resolve the dispute, including a covenant not to sue or a standstill.

178. During the March 21, 2022 call, Fortinet responded that it would require the same value for its portfolio—$100,000,000—regardless of form.

179. During the March 21, 2022 call, Netskope asked for the basis for Fortinet's $100,000,000 demand or how Fortinet had calculated that amount.

180. During the March 21, 2022 call, Fortinet provided no basis for its $100,000,000 demand or explanation for how it had calculated that amount.

181. During the March 21, 2022 call, Fortinet did not identify the patent claims Fortinet contended were infringed.

182. During the March 21, 2022 call, Fortinet did not provide a claim chart or support for its infringement allegations.

183. During the March 21, 2022 call, Fortinet did not identify any Netskope products that allegedly infringed Fortinet's patents.

184. Netskope followed-up with Fortinet hours after the parties' call.

185. Netskope's March 21, 2022 email stated Netskope's understanding that Fortinet was only offering a license to its entire portfolio.

186. Netskope's March 21, 2022 email reiterated that Netskope did not believe it infringed any of the patents Fortinet had identified.

187. Netskope's March 21, 2022 email expressed Netskope's willingness to negotiate a reasonable license fee to avoid litigation.

188.    Fortinet responded on March 22, 2022.

189.    Fortinet's March 22, 2022 email made a proposal based around a percentage of Netskope's revenue.

190.    Fortinet's March 22, 2022 email threatened that any damages Fortinet would pursue in litigation would be greater than the amount Netskope would pay using Fortinet's proposed equation.

191.    Fortinet's March 22, 2022 email did not identify the patent claims Fortinet contended were infringed.

192.    Fortinet's March 22, 2022 email did not identify any Netskope products that allegedly infringed Fortinet's patents.

193.    Fortinet's March 22, 2022 email did not provide a claim chart.

194.    Fortinet's March 22, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

195.    Netskope responded on March 23, 2022.

196.    Netskope's March 23, 2022 email expressed Netskope's disappointment in Fortinet's proposal.

197.    Netskope's March 23, 2022 email explained that, based on Fortinet's 10-K filings, the structure and price of Fortinet's proposal was substantially more than Fortinet had accepted previously.

198.    Netskope's March 23, 2022 email stated that Netskope could not accept Fortinet's high licensing demand.

199.    Netskope's March 23, 2022 email said that Netskope is a business and is reasonable.

200.    Netskope's March 23, 2022 email explained that offers like the one Fortinet made do not leave Netskope any ability to respond productively.

201.    Netskope emailed Fortinet again on March 24, 2022.

202.    Netskope's March 24, 2022 email explained that, after careful consideration, Netskope had decided to file a declaratory judgment action of noninfringement.

203.    Netskope's March 24, 2022 email expressed Netskope's openness to continue discussing a business resolution with Fortinet.

204.    Netskope's March 24, 2022 email said that Netskope welcomed any reasonable proposals.

205.    Netskope's March 24, 2022 email said that it appeared Fortinet had no intention of being reasonable based, at least in part, on Fortinet's latest demands.

206.    Netskope's March 24, 2022 email said that it appeared Fortinet had no intention of being reasonable based, at least in part, on Fortinet refusing to provide evidence of infringement.

207.    Netskope's March 24, 2022 email said that it appeared Fortinet had no intention of being reasonable based, at least in part, on Fortinet refusing to provide any license valuation.

208.    Netskope's March 24, 2022 email expressed that Netskope felt it had no alternative but to ask a court to clear its name so it could freely operate.

209.    Netskope's March 24, 2022 complaint in Netskope's Declaratory Judgement Action sought declaratory judgment of noninfringement on the six patents Fortinet had raised in correspondence, *i.e.*, U.S. Patent Nos. 10,237,282 ("the '282 Patent), 9,197,601 ("the '601 Patent"), 10,826,941 ("the '941 Patent"), 8,793,151 ("the '151 Patent"), 9,225,734 ("the '734 Patent"), and 11,032,301 ("the '301 Patent").

210.    On March 25, 2022, after Netskope filed its original complaint in Netskope's Declaratory Judgement Action, Fortinet sent Netskope a letter.

211.    Fortinet's March 25, 2022 letter claimed that "Netskope's infringement of Fortinet's patents goes far beyond the exemplary six patents identified in response to [Netskope's] request for information…."

212.    Fortinet's March 25, 2022 letter "reserve[d] the right to pursue injunctive relief against Netskope and its customers…."

213.    Fortinet's March 25, 2022 letter stated that "Fortinet's offer for a three-year mutual covenant-not-to-sue on its 1,200-plus patents is now $300 million."

214.    Fortinet's March 25, 2022 letter reserved the right to terminate Fortinet's $300 million offer and claimed it would terminate no later than its filing in response to Netskope's complaint.

215.    Fortinet's March 25, 2022 letter stated that, after its offer expires, "Fortinet intends to explore pursing significantly more than [$300 million] in damages."

216.    Fortinet's March 25, 2022 letter did not identify the patent claims Fortinet contended were infringed.

217.    Fortinet's March 25, 2022 letter did not identify any Netskope products that allegedly infringed Fortinet's patents.

218.    Fortinet's March 25, 2022 letter did not provide a claim chart.

219.    Fortinet's March 25, 2022 letter did not provide any quantitative basis for Fortinet's financial demands.

220.    Netskope responded on April 4, 2022.

221.    Netskope's April 4, 2022 letter reiterated that Netskope does not infringe any of the patents Fortinet had identified.

222.    Netskope's April 4, 2022 letter explained that Fortinet's licensing demands have been unreasonable because, *inter alia*, they consistently increased over time without justification.

223.    Netskope's April 4, 2022 letter explained that, for example, Fortinet's initial demand for $100 million had now increased to $300 million, with threats of going higher.

224.    Netskope's April 4, 2022 letter explained that Fortinet's SEC disclosures show Fortinet had licensed its portfolio to Palo Alto Networks for less than Fortinet was demanding from Netskope.

225.    Netskope's April 4, 2022 letter reiterated that Fortinet had still failed to provide information to support its infringement allegations or its licensing demand.

226.    Netskope's April 4, 2022 letter reiterated Netskope's commitment to a reasonable business resolution.

227.    Netskope's April 4, 2022 letter explained that Netskope would hold-off serving the complaint with the hope that the extra time would lead to productive discussions between the parties.

COMPLAINT FOR PATENT INFRINGEMENT                    -21-

228.    Netskope's April 4, 2022 letter reiterated that Netskope stood ready to continue discussions with Fortinet.

229.    Fortinet responded on April 7, 2022.

230.    Fortinet's April 7, 2022 email claimed its settlement proposal was "significantly less than [Fortinet] will seek in litigation."

231.    Fortinet's April 7, 2022 email did not identify the patent claims Fortinet contended were infringed.

232.    Fortinet's April 7, 2022 email did not identify any Netskope products that allegedly infringed Fortinet's patents.

233.    Fortinet's April 7, 2022 email did not provide a claim chart.

234.    Fortinet's April 7, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

235.    Netskope responded on April 11, 2022.

236.    Netskope's April 11, 2022 email reiterated that Fortinet had failed to provide any evidence of infringement.

237.    Netskope's April 11, 2022 email reiterated that Netskope does not infringe the patents Fortinet had identified.

238.    Netskope's April 11, 2022 email reiterated that Fortinet's existing licensing demands were unreasonable.

239.    Netskope's April 11, 2022 email stated that Fortinet's public filings show a $36 million valuation for a multiyear patent license to Palo Alto Networks.

240.    Netskope's April 11, 2022 email explained that Fortinet's demands of $300 million and $100 million plus a percentage of Netskope's annual revenue were not reasonable in light of Fortinet's agreement with Palo Alto Networks.

241.    Netskope's April 11, 2022 email explained that Netskope was willing to consider a reasonable proposal, should Fortinet provide one.

242.    Fortinet responded on April 12, 2022.

243.    Fortinet's April 12, 2022 email claimed its "patent portfolio is public and available to Netskope and its outside counsel."

244.    Fortinet's April 12, 2022 email said Fortinet would "consider a license to two identified patents and a 3 year mutual patent covenant not to sue in return for a lump sum up front payment for the license and quarterly payments over the next three years for the covenant not to sue."

245.    Fortinet's April 12, 2022 email reiterated that Fortinet's prior demands were null and void and it "expects an increased reasonable settlement amount (vs [its] earlier proposal), now that Netskope has decided to initiate litigation."

246.    Fortinet's April 12, 2022 email did not identify the patent claims Fortinet contended were infringed.

247.    Fortinet's April 12, 2022 email did not identify any Netskope products that allegedly infringed Fortinet's patents.

248.    Fortinet's April 12, 2022 email did not provide a claim chart.

249.    Fortinet's April 12, 2022 email did not provide any quantitative basis for Fortinet's financial demands.

250.    Netskope responded on April 22, 2022.

251.    Netskope's April 22, 2022 email explained that Netskope had been waiting to serve Fortinet with the hope that Fortinet would make a reasonable, good faith proposal.

252.    Netskope's April 22, 2022 email reiterated that Netskope does not infringe any of the patents Fortinet had identified.

253.    Netskope's April 22, 2022 email explained that Fortinet's most recent demand seemed to only be reiterating Fortinet's previous unreasonable demands.

254.    Netskope's April 22, 2022 email explained that, given Fortinet's demands, Netskope had little choice but to move forward with the present action.

255.    Netskope's April 22, 2022 email explained that it remained open to any reasonable offer should Fortinet's views change.

256.    As noted above, the April 24, 2022 complaint addressed six patents Fortinet had threatened to assert against Netskope.

257.    After filing the complaint, Fortinet indicated to Netskope that it did not plan to assert infringement counterclaims regarding a subset of the six patents addressed in Netskope's April 24 complaint.

258.    On July 11, Fortinet provided a signed covenant not to sue Netskope on the '151, '734, and '301 Patents voluntarily and without compensation.

259.    On July 26, 2022, Fortinet filed counterclaims to Netskope's First Amended Complaint, alleging that Netskope infringed the '282 and '601 patents.

260.    On August, 30, 2022, Fortinet filed additional counterclaims to Netskope's First Amended Complaint, alleging that Netskope infringed U.S. Patent Nos. 9,231,968, 9,280,678, and 10,084,825.

## VI.    Even Though Netskope Invalidated Broad Claims of the Fortinet Patents-in-Suit Via *Inter Partes* Review, Fortinet Did Not Withdraw Its Infringement Allegations.

261.    While investigating Fortinet's asserted patents, Netskope identified several prior art references that brought their validity into question.

262.    Netskope ultimately filed petitions for *inter partes* review with the Patent Trial and Appeal Board (PTAB) challenging the validity of Fortinet's patents.

263.    On March 6, 2024, the PTAB issued a Final Written Decision determining all challenged claims of the '282 Patent—claims 1-8 and 11-18—were unpatentable under 35 U.S.C. § 103.

264.    On August 12, 2024, the PTAB issued a Final Written Decision determining all challenged claims of the '678 Patent—claims 1-3, 6, 8-17, and 21-27—were unpatentable under 35 U.S.C. § 103.

265.    On August 19, 2024, the PTAB issued a Final Written Decision determining all challenged claims of the '825 Patent—claims 1-7 and 10-31—were unpatentable under 35 U.S.C. § 103.

266.    On November 11, 2024, after the PTAB invalidated much of Fortinet's asserted patents, Netskope contacted Fortinet to restart discussions about reaching a reasonable business resolution.

267.    During discussions between the parties, Fortinet did not withdraw its infringement allegations for its patents.

**VII.    Netskope Reluctantly Brought a Declaratory Judgment Action**

268.    Because of Fortinet's repeated threats of litigation and steadfast refusal to provide support for its accusations of patent infringement, Netskope had no viable alternative but to bring a declaratory judgment action.

269.    For months, Fortinet repeatedly threatened to sue Netskope for patent infringement. During that time, Netskope repeatedly requested the basis for Fortinet's threats and support for its exorbitant settlement demands.  At every turn, Fortinet flatly refused Netskope's requests for this basic information.

270.    Specifically, Fortinet was unwilling to identify the individual patent claims it thinks Netskope infringes, the specific Netskope products it believes are infringing, or to provide infringement charts illustrating its infringement allegations.

271.    Similarly, Fortinet refused to provide any evidence or calculations to support its demand for $100 million in damages.

272.    Despite Fortinet's bad-faith negotiation techniques and unreasonable financial demands, Netskope tried for months to find common ground for a reasonable business resolution. Taken together, Netskope made at least four overtures to Fortinet attempting to conduct a good-faith dialogue, yet those efforts were met with nothing but silence and stonewalling.

273.    As it became clearer that Fortinet's negotiations were merely a pretext to bully Netskope—as Fortinet has done to other companies in the past—Netskope realized it had no choice remaining but to bring this lawsuit to protect its customers, company, and investors.  Accordingly, it filed a complaint in Netskope's Declaratory Judgement Action seeking declaratory relief.

**VIII.    Netskope Now Files this Complaint for Patent Infringement**

274.    During the declaratory judgment action, Netskope discovered that Fortinet infringed several of Netskope's Patents.

275.    On November 11, 2024, Netskope notified Fortinet via letter that its products infringe Netskope's Patents.

276.    After receipt of Netskope's letter, Fortinet failed to take any action to stop its infringement of Netskope's Patents.

277.    Netskope subsequently filed a motion to supplement its declaratory judgement complaint to add claims for Fortinet's infringement of several of Netskope's Patents.

278.    The Court denied Netskope's motion to supplement.

279.    With no other option, Netskope now files this complaint against Fortinet for infringing Netskope's Patents.

**IX.    Netskope's Patents**

280.    Netskope is the current owner and assignee of over 200 U.S. patents, including U.S. Patent Nos. 8,356,336 (the "'336 Patent"), 8,543,710 (the "'710 Patent"), 8,117,639 (the "'639 Patent"), 8,224,983 (the "'983 Patent"), 8,327,426 (the "'426 Patent"), 7,593,936 (the "'936 Patent"), 8,397,282 (the "'282 Patent"), 8,661,153 (the "'153 Patent"), and 8,635,697 (the "'697 Patent") (collectively "Netskope's Patents").

281.    Netskope's Patents cover important innovations in network and computer security, as discussed in detail below.

**The '336 Patent**

282.    On November 16, 2009, Keith Johnson, Eric White, and John Martin filed U.S. Patent Application No. 12/619,560, entitled "System and Method for Double-Capture/Double-Redirect to a Different Location."

283.    U.S. Patent Application No. 12/619,560 duly and legally issued as the '336 Patent on January 15, 2013.  The '336 Patent is attached hereto as Exhibit 1.

284.    The '336 Patent relates to a "system, method, and computer program product for providing network access control for a shared network."  ('336 Patent, Abstract.)

285.    Netskope is the owner of all rights, title, and interest in and to the '336 Patent, with the full and exclusive right to bring suit to enforce the '336 Patent, including the right to recover for past infringement.

286.    The '336 Patent is valid and enforceable.

287.    The invention described in the '336 Patent offers an improved method and system to enhance a network access controller by using "Pre-Authentication Capture Destination" to provide network access control for a shared network. ('336 Patent at 1:66-2:2). The patented invention improved upon earlier methods of the prior art by allowing unauthenticated users to access certain network resources within the walled garden without authentication. (*Id*. at 2:2-16.)

288.    The patent thus allows a public or private network service provider to automatically redirect anonymous clients to a pre-defined destination within a limited set of network destinations. (*Id*. at 2:47-59.) The redirection occurs automatically if the anonymous client attempts to access a resource outside the allowed set. (*Id*.)

289.    The claims of the '336 Patent recite an invention that is not merely the routine or conventional use of computers. (*See id*. at 1:34-62; 2:2-40.) Instead, the invention makes use of specific client-server computer and network architecture. (*See id.* at 2:7-40.) The '336 Patent claims thus specify how computing devices, remote servers, and network controllers are manipulated to yield a desired result.  (*See generally id*. at 6:26-10:15.)

290.    The technology claimed in the '336 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See id.* at 1:66-2:59.) Each claim of the '336 Patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept. (*See, e.g.,* Ex. 1.)

**The '710 Patent**

291.    On March 10, 2005, Patrick Turley, Keith Johnston, and Steven D. Tonnesen filed U.S. Patent Application No. 11/076,591, entitled "Method and System for Controlling Network Access."

292.    U.S. Patent Application No. 11/076,591 duly and legally issued as the '710 Patent on September 24, 2013.  The '710 Patent is attached hereto as Exhibit 2.

293.    The '710 Patent relates to a "network communication may be received and the client that originated this communication determined."  ('710 Patent, Abstract.)

294.    Netskope is the owner of all rights, title, and interest in and to the '710 Patent, with the full and exclusive right to bring suit to enforce the '710 Patent, including the right to recover for past infringement.

295.    The '710 Patent is valid and enforceable.

296.    The invention described in the '710 Patent offers methods for confining a network client's network access to a specific region of the network. ('710 Patent at 1:58-61.) The patented invention improved upon earlier methods of the prior art by allowing a client device to access a limited number of network resources after the network service provider has constrained the user for various reasons (apply security patches, requiring additional payment or authorization, etc.). (*Id.* at 1:61-2:8.)

297.    The patent also allows a public or private network service provider to make use of network firewall rule technology, configured to recognize clients by identity or membership in a group. (*Id.* at 2:9-14.) The invention further allows a method to reduce and isolate virus and worm infections at remote venues, helping to preserve service integrity and maintain control of the network. (*Id.* at 2:20-29.)

298.    The claims of the '710 Patent recite an invention that is not merely the routine or conventional use of computers. (*See id.* at 1:58-2:29.) Instead, the invention makes use of specific client-server computer and network architecture for varied purposes. (*See id.* at 2:1-29.) The '710 Patent claims thus specify how computing devices, remote servers, and network gateways are manipulated to yield a desired result.  (*See, e.g., id.* at 3:41-6:28.)

299.    The technology claimed in the '710 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See id.* at 1:58-2:29.) Each claim of the '710 Patent recites a

combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept. (*See, e.g.,* Ex. 2.)

**The '639 Patent**

300.    On October 10, 2003, Richard Mackinnon, Kelley Looney, and Eric White filed U.S. Patent Application No. 10/683,317, entitled "System and Method for Providing Access Control."

301.    U.S. Patent Application No. 10/683,317 duly and legally issued as the '639 Patent on February 14, 2012.  The '639 Patent is attached hereto as Exhibit 3.

302.    The '639 Patent relates to "systems and methods for provisioning network access for a user in order to provide access control to one or more networks with regard to the user." ('639, Abstract.)

303.    Netskope is the owner of all rights, title, and interest in and to the '639 Patent, with the full and exclusive right to bring suit to enforce the '639 Patent, including the right to recover for past infringement.

304.    The '639 Patent is valid and enforceable.

305.    The invention described in the '639 Patent offers a system and method for provisioning network access for a user, which provides the user with access control to one or more networks." ('639 Patent at Abstract.) Embodiments of the invention disclose that after authentication, the network will establish provisioning rules associated with an authenticated user's profile that control the user's access to one or more networks. (*Id.*) In other embodiments that include multiple users, the invention allows users to successfully access one or more networks simultaneously without the impedance or exclusion of other users. (*Id.*)

306.    The patent also allows for authentication of users by determining if a network communication is associated with an authenticated user, and if not, directing the user to an authentication interface wherein the system receives and authenticates credentials from the user. (*Id.* at 3:4-12.) If the user is successfully authenticated, the network interface receives a profile associated with the authenticated user. (*Id.*) The invention discloses several advantages over the prior art, including but not limited to, providing network access on a per-user rather than per-port basis and authenticating users without using proprietary client software. (*Id.* at 3:17-29.)

307.    The claims of the '639 Patent recite an invention that is not merely the routine or conventional use of computers. (*See id.* at 2:21-3:29.) Instead, the invention makes use of specific client-server computer and network architecture for varied purposes. (*See id.* at 2:21-42.) The '639 Patent claims thus specify how computing devices, remote servers, and network gateways are manipulated to yield a desired result. (*See, e.g., id.* at 2:52-3:12.)

308.    The technology claimed in the '639 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See id.* at 1:20-3:29.) Each claim of the '639 Patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept. (*See, e.g.,* Ex. 3.)

**The '983 Patent**

309.    On April 2, 2010, Tuan Ta, Patrick Turley, Kerry Clendinning, and Kelly Looney filed U.S. Patent Application No. 12/753,390, entitled "System and Method for Dynamic Bandwidth Provisioning."

310.    U.S. Patent Application No. 12/753,390 duly and legally issued as the '983 Patent on July 17, 2012.  The '983 Patent is attached hereto as Exhibit 4.

311.    The '983 Patent relates to a "system, method, and computer program product for providing network access control for a shared network."  ('983 Patent, Abstract.)

312.    Netskope is the owner of all rights, title, and interest in and to the '983 Patent, with the full and exclusive right to bring suit to enforce the '983 Patent, including the right to recover for past infringement.

313.    The '983 Patent is valid and enforceable.

314.    The invention described in the '983 Patent offers a control device and method for allocating network bandwidth to users accessing a controlled network. ('983 Patent at Abstract). Embodiments of the invention disclose that after a user connects to the control device, the control deice obtains a user bandwidth allocation profile for that user based on user credentials. (*Id.*) A provisioning module executing on the control device then maps and associates the attributes in the user bandwidth allocation profile to a traffic control rule. (*Id.*) In other embodiments, a traffic

conditioning module executing on the control device regulates the user's network bandwidth usage in view of the traffic control rule associated with the user. (*Id*.)

315.    The patent also allows for the retrieval of a set of user profiles associated with specific users and establishing bandwidth limits for each user based on its corresponding profile. (*Id*. at 2:62-67.) The method disclosed also regulates and updates each user's network bandwidth based on the limit established for that user. (*Id*. at 2:67-3:4.) The invention discloses several advantages over the prior art, including but not limited to, allowing bandwidth to be provisioned, metered, and dynamically updated on a per user basis. (*Id*. at 3:17-27.)

316.    The claims of the '983 Patent recite an invention that is not merely the routine or conventional use of computers. (*See id*. at 2:17-3:27.) Instead, the invention makes use of specific client-server computer and network architecture for varied purposes. (*See id*. at 2:34-61.) The '983 Patent claims thus specify how computing devices, remote servers, and network gateways are manipulated to yield a desired result.  (*See, e.g., id*. at 3:17-27.)

317.    The technology claimed in the '983 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See generally id*. at 1:29-3:27.) Each claim of the '983 Patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept. (*See, e.g.*, Ex. 4.)

**The '426 Patent**

318.    On June 1, 2006, Stephen Hugh Kinser, Lloyd Leon Burch, and Cameron Craig Morris filed U.S. Patent Application No. 11/444,944, entitled "Single Sign On with Proxy Services."

319.    U.S. Patent Application No. 11/444,944 duly and legally issued as the '426 Patent on December 4, 2012.  The '426 Patent is attached hereto as Exhibit 5.

320.    The '426 Patent relates to "[t]echniques for proxing services with a single sign on." ('426 Patent, Abstract.)

321.    Netskope is the owner of all rights, title, and interest in and to the '426 Patent, with the full and exclusive right to bring suit to enforce the '426 Patent, including the right to recover for past infringement.

1   322.   The '426 Patent is valid and enforceable.

2   323.   The invention described in the '426 Patent discloses techniques for proxing services

3   with a single sign on. ('426 Patent at Abstract). Specifically, the patent discloses a principal which

4   authenticates to a first identity service that is in a trusted relationship with a second identity service.

5   (*Id.*) The principal sends a second authentication request to a second identity service, wherein the

6   request includes an authentication response supplied by the first identity service in response to the

7   successful authentication of the principal. (*Id.*) The principal is then authenticated to access the

8   second identity service. (*Id.*).

9   324.   The patent also discloses that additional security precautions may be enabled for the

10   single sign-on process. (*Id.* at 5:26-28.) This additional authentication response may include an

11   instruction to the targeted identity service to independently authenticate the principal via its own

12   challenge and response dialogue with the principal. (*Id.* at 5:28-35.)

13   325.   The claims of the '426 Patent recite an invention that is not merely the routine or

14   conventional use of computers. (*See id.* at 1:59-2:3.) Instead, the invention makes use of specific

15   client-server computer and network architecture for varied purposes. (*See id.* at 4:4-24.) The '426

16   Patent claims thus specify how computing devices, remote servers, and network gateways are

17   manipulated to yield a desired result.  (*See, e.g., id.* at 9:1-10-6.)

18   326.   The technology claimed in the '426 Patent does not preempt all ways of using client-

19   server computing architectures or the use of all network access controller technologies, or any other

20   well-known or prior art technology. (*See generally id.* at 1:11-2:3.) Each claim of the '426 Patent

21   recites a combination of elements sufficient to ensure that the claim in practice amounts to

22   significantly more than a patent on an ineligible concept. (*See, e.g.,* Ex. 5.)

23   **The '936 Patent**

24   327.   On August 11, 2004, David Eugene Hooks filed U.S. Patent Application No.

25   10/916,956, entitled "Systems and Methods for Automated Computer Support."

26   328.   U.S. Patent Application No. 10/916,956 duly and legally issued as the '936 Patent

27   on September 22, 2009.  The '936 Patent is attached hereto as Exhibit 6.

28

329.    The '936 Patent relates to methods that "include[] receiving a plurality of snapshots from a plurality of computers, storing the plurality of snapshots in a data store, and creating an adaptive reference model based at least in part on the plurality of snapshots."  ('936 Patent, Abstract.)  The method also comprises "comparing at least one of the plurality of snapshots to the adaptive reference model, and identifying at least one anomaly based on the comparison." *Id.*

330.    Netskope is the owner of all rights, title, and interest in and to the '936 Patent, with the full and exclusive right to bright suit to enforce the '936 Patent, including the right to recover for past infringement.

331.    The '936 Patent is valid and enforceable.

332.    The invention described in the '936 Patent offers both "systems and methods for automated computer support."  ('936 Patent at 3:42-43.)  In addition to the system and method described in the abstract, the '936 Patent discloses "a computer-readable medium (such as, for example random access memory or a computer disk) [which] comprises code for carrying out such a method." (*Id*. at 3:50-54.)

333.    The patent further discloses that the automated compute support facility may be a single facility or comprise multiple facilities, which includes a firewall for providing security to data stored within the automatic support facility.  (*Id*. at 4:54-61.)  The automated support facility includes hardware and software for implementing and storing an adaptive reference model in a database component.  (*Id.* at 5:4-15.)

334.    The claims of the '936 Patent recite an invention that is not merely the routine or conventional use of computers.  (*See id.* at 4:49-5:36; 6:16-7:45.)  Instead, the invention makes use of specific client-server computer and network architecture. (*See id.* at 6:16-7:45.)  The '936 Patent claims thus specify how computing devices, remote servers, and network controllers are manipulated to yield a desired result.  (*See generally id.* at 15:52-16:20.)

335.    The technology claimed in the '936 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See id.* at 4:49-5:36.)  Each claim of the '936 Patent recites a

combination of elements sufficient to ensure that the claim in practice amounts to significantly
more than a patent on an ineligible concept. (*See, e.g.,* Ex. 6.)

**The '282 Patent**

336.    On April 22, 2011, Patrick Turley and Eric White filed U.S. Patent Application No.
13/092,488, entitled "Dynamically Adaptive Network Firewalls and Method, System and
Computer Program Product Implementing Same."

337.    U.S. Patent Application No. 13/092,488 duly and legally issued as the '282 Patent
on March 12, 2013.  The '282 Patent is attached hereto as Exhibit 7.

338.    The '282 Patent relates to a "system, method, and computer program product for
controlling data through a firewall which may be dynamically configurable."  ('282 Patent,
Abstract.)

339.    Netskope is the owner of all rights, title, and interest in and to the '282 Patent, with
the full and exclusive right to bring suit to enforce the '282 Patent, including the right to recover
for past infringement.

340.    The '282 Patent is valid and enforceable.

341.    The invention described in the '282 Patent discloses an automated system that
"dynamically add[s] new network interface abstractions or groupings of interface abstractions and
tailoring the behavior of those abstractions to the network client devices' specific needs."  ('282
Patent at 2:46-50.)  The patented invention improved upon earlier methods of prior art by
automatically creating specific firewall configurations with minimal input by a human operator.
(*Id.* at 2:50-55.)

342.    The patent thus allows the firewall to dynamically react to changes on the network
traffic, such as the addition or removal of network interfaces.  (*Id.* at 3:10-12.)  The invention also
discloses that the invention can elucidate and synthesize the network traffic for further processing
by human operators.  (*Id.* at 3:5-9.)

343.    The claims of the '282 Patent recite an invention that is not merely the routine or
conventional use of computers.  (*See id*. at 2:42-3:17.)  Instead, the invention makes use of specific
client-server computer and network architecture. (*See id.* at 5:5-6:36.) The '282 Patent claims thus

specify how computing devices, remote servers, and network controllers are manipulated to yield a desired result.  (*See generally id.* at 4:35-5:35.)

344.   The technology claimed in the '282 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See id.* at 2:42-3:17.) Each claim of the '282 Patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept. (*See, e.g.,* Ex. 7.)

**The '153 Patent**

345.   On July 20, 2009, Tuan Ta, Patrick Turley, Kerry Clendinning, and Kelly Looney filed U.S. Patent Application No. 12/506,140, entitled "System and Method for Dynamic Bandwidth Provisioning."

346.   U.S. Patent Application No. 12/506,140 duly and legally issued as the '153 Patent on February 25, 2014.  The '153 Patent is attached hereto as Exhibit 8.

347.   The '153 Patent relates to a "control device and a method executing thereon for allocating network bandwidth to users accessing a controlled network." ('153 Patent, Abstract.)

348.   Netskope is the owner of all rights, title, and interest in and to the '153 Patent, with the full and exclusive right to bring suit to enforce the '153 Patent, including the right to recover for past infringement.

349.   The '153 Patent is valid and enforceable.

350.   The invention described in the '153 Patent discloses a control device that allocates network bandwidth on a per-user basis. ('153 Patent at 2:17-19.)  The patented invention improved upon earlier methods of prior art by metering and dynamically updating users' network bandwidth allocation.  (*Id.* at 3:16-23.)

351.   The patent thus allows computer instructions to retrieve user profiles, which correspond to a specific user and contains certain attributes to allocate network bandwidth. (*Id.* at 2:32-41.) The invention also discloses that the invention can continuously control and update network bandwidth limitations for multiple users. (*Id.* at 2:42-43.)

352.    The claims of the '153 Patent recite an invention that is not merely the routine or conventional use of computers. (*See id.* at 2:14-3:15.)  Instead, the invention makes use of specific client-server computer and network architecture. (*See id.* at 4:29-5:12.) The '153 Patent claims thus specify how computing devices, remote servers, and network controllers are manipulated to yield a desired result.  (*See generally id.* at 7:5-8:10.)

353.    The technology claimed in the '153 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See id.* at 2:14-3:26.) Each claim of the '153 Patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept. (*See, e.g.*, Ex. 8.)

**The '697 Patent**

354.    On April 8, 2011, Kevin McNamee, Mike Pelley, Darren Deridder, and Paul Edwards filed U.S. Patent Application No. 13/083,501, entitled "Method and System for Operating System Identification in a Network Based Security Monitoring Solution."

355.    U.S. Patent Application No. 13/083,501 duly and legally issued as the '697 Patent on January 21, 2014.  The '697 Patent is attached hereto as Exhibit 9.

356.    The '697 Patent relates to a "method and system for providing network based malware detection in a service provider network." ('697 Patent, Abstract.)

357.    Netskope is the owner of all rights, title, and interest in and to the '697 Patent, with the full and exclusive right to bring suit to enforce the '697 Patent, including the right to recover for past infringement.

358.    The '697 Patent is valid and enforceable.

359.    The invention described in the '697 Patent discloses a method for receiving transmission control protocol (TCP) packets originating from a network device coupled to the service provider network, wherein an alert is generated if malware is present in the TCP session. ('697 Patent at 1:54-67.)  The patented invention improved upon earlier methods of prior art by identifying the OS ID and malware ID of the TCP session that generated the malware alert.  (*Id.* at 1:25-67.)

360.    The invention also discloses comparing a malware signature to the TCP packets before generating the alert nothing that malware is present in the TCP session. (*Id.* at 2:26-43.)  In one embodiment, the patent also discloses a remediation portal which compares the OS associated with the OS ID of the computing device in the malware alert and provides remediation to that computing device.  (*Id.* at 2:1-25.)

361.    The claims of the '697 Patent recite an invention that is not merely the routine or conventional use of computers. (*See id.* at 1:52-2:43.)  Instead, the invention makes use of specific client-server computer and network architecture. (*See id.* at 4:10-5:62.) The '697 Patent claims thus specify how computing devices, remote servers, and network controllers are manipulated to yield a desired result.  (*See generally id*. at 6:51-7:55.)

362.    The technology claimed in the '697 Patent does not preempt all ways of using client-server computing architectures or the use of all network access controller technologies, or any other well-known or prior art technology. (*See id*. at 1:25-4:43.) Each claim of the '697 Patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept. (*See, e.g.,* Ex. 9.)

## THE PARTIES

363.    Netskope, Inc. is a Delaware corporation with its principal place of business at 2445 Augustine Drive, Suite 301, Santa Clara, California 95054.

364.    On information and belief, Fortinet, Inc. is a Delaware corporation with its principal place of business at 899 Kifer Road, Sunnyvale, California 94086-5205.

## JURISDICTION AND VENUE

365.    This is an action for a judgment that Fortinet infringes Netskope's Patents under the patent laws of the United States, 35 U.S.C. § 101 et seq.

366.    This Court has subject matter jurisdiction over the claims alleged in this action under 28 U.S.C. §§ 1331 and 1338(a) because this Court has exclusive jurisdiction over infringement claims arising under the patent laws of the United States.  *See* 28 U.S.C. §§ 1331 and 1338(a).

367.    This Court has personal jurisdiction over Fortinet at least because of its continuous and systematic contacts within the State of California and this District.  As noted above, Fortinet's

1  principal place of business is located within the District and it has been registered to do business in

2  the State of California since at least December 14, 2000, as shown on the California Secretary of

3  State website.  Fortinet has also consented to jurisdiction in this District because it has used this

4  District to enforce its patent rights against Netskope in Netskope, Inc. v. Fortinet, Inc., Case No.

5  3:22-cv-01852.

6          368.    Fortinet is also subject to specific personal jurisdiction in this District because it has

7  performed activities in this District that infringe Netskope's Patents.

8          369.    Exercising personal jurisdiction over Fortinet does not offend traditional notions of

9  fairness and substantial justice due to Fortinet's substantial presence and activities in this District.

10         370.    Venue in this District is proper under 28 USC §§ 1391(b)(1) and 1391(b)(2) at least

11  because Fortinet maintains its principal place of business in this District, a substantial part of the

12  events or omissions giving rise to the claims occurred in this District, including Fortinet's acts of

13  infringement, and Fortinet purposefully directed activities to this District.

14                              **INTRADISTRICT ASSIGNMENT**

15         371.    This is an intellectual property action subject to district-wide assignment under Civil

16  Local Rules 3-2(c).

17                              **FIRST CLAIM FOR RELIEF**

18                      **(Infringement of U.S. Patent No. 8,356,336)**

19         372.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

20         373.    The '336 Patent contains 3 independent claims, i.e., claims 1, 9, and 16.  Claim 1

21  recites:

22  A method for automatic pre-authentication redirection of network traffic,
   comprising:

23

24          providing a network access controller in a shared network, wherein the
   shared network comprises a plurality of server computers and a set of network
   destinations hosted on the plurality of server computers;

25

26          intercepting at the network access controller a request to access a network
   resource from a browser application running on a client device within the shared
   network associated with an anonymous user;

27

28          determining whether the network resource referenced in the request is in the
   set of network destinations hosted on the plurality of server computers in the shared

network;

if the network resource is in the set of network destinations hosted on the plurality of server computers in the shared network, directing the browser application running on the client device within the shared network associated with the anonymous user to the network resource; and

if the network resource is not in the set of network destinations hosted on the plurality of server computers in the shared network, redirecting the browser application running on the client device within the shared network associated with the anonymous user to a pre-authentication capture destination hosted on a first server computer, wherein the first server computer is one of the plurality of server computers in the shared network and wherein from the pre-authentication capture destination the anonymous user is free to visit any of the set of network destinations hosted on the plurality of server computers in the shared network without authentication.

374.    Netskope owns all rights, title, and interest in the '336 Patent.

375.    On November 11, 2024, Netskope notified Fortinet that its products infringe Netskope's Patents.

376.    Despite knowing of its infringement, Fortinet has continued to infringe the '336 patent.

377.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings these claims to stop Fortinet's infringement and recover damages sufficient to compensate Netskope for Fortinet's infringement.

378.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products including but not limited to FortiGate.

379.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '336 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to, FortiGate.

380.    For example, FortiGate infringes claim 1 of the '336 Patent as detailed in Exhibit 10 attached hereto.

381.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiGate, Fortinet has injured Netskope and is liable to Netskope for directly infringing one or more claims of the '336 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

382.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or more claims of the '336 Patent by knowingly and intentionally inducing others, including Fortinet customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

383.    Fortinet, with knowledge that these products, or the use thereof, infringe the '336 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '336 Patent by providing these products to end-users for use in an infringing manner without authority in violation of 35 U.S.C. § 271(b).

384.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer for sale, or import any products that embody the inventions of the '336 Patent.

385.    Fortinet is using the technology claimed in the '336 Patent without paying a reasonable royalty.  As a result of infringement of the '336 Patent by Fortinet, Netskope has suffered monetary damages, and seeks recovery in an amount adequate to compensate for that infringement, but in no event less than a reasonable royalty for the use made of the invention by Fortinet with interest and costs as fixed by the Court.

386.    Fortinet is infringing the '336 Patent in a manner best described as willful, deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified Fortinet that it infringed the '336 Patent on November 11, 2024.  Despite that, Fortinet has continued to willfully infringe the '336 Patent in bad faith.  Thus, Netskope is entitled to enhanced damages under 35 U.S.C. § 284.

387.    Fortinet became aware of the '336 Patent no later than approximately November 11, 2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its Accused Products within the United States without the authority of Netskope.  By way of example, Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to promote the Accused Products.  Upon information and belief, the Accused Products contain components for use in practicing at least one claim of the '336 Patent that constitute a material part

1   of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that

2   such components are especially made for use in infringing at least one claim of the '336 Patent and

3   are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing

4   actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one

5   claim of the '336 Patent.

6          388.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs

7   and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way

8   of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation

9   to its customers instructing its customers to perform each element of claim 1, and conditions proper

10  operation of the Fortinet products on performance of each element of claim 1.

11         389.    Netskope has suffered, and will continue to suffer, irreparable harm as a result of

12  Fortinet's infringement of the '336 Patent for which there is no adequate remedy at law, unless

13  Fortinet's infringement is enjoined by this Court.

14                              **SECOND CLAIM FOR RELIEF**

15                        **(Infringement of U.S. Patent No. 8,543,710)**

16         390.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

17         391.    The '710 Patent contains 3 independent claims, i.e., claims 1, 8, and 15.  Claim 1

18  recites:

19         A method of network traffic quarantine control, comprising:

20              at a network access gateway device between a local network and the
21         Internet, selecting a client device in a first network segment of the network;

22              at the network access gateway device, performing a plurality of quarantine
        control functions over the client device, wherein the plurality of quarantine
23         control functions comprises:

24              a) restricting all network traffic emanating from the client device to one or
        more network destination addresses that are not in or subordinate to the first
25         network segment;

26              b) restricting all network traffic emanating from the client device to an
        allowed network destination address to selected one or more network protocols;
27         and

28              rendering a web page to display on the client device from the network access
        gateway device, wherein the web page contains an offer for a user of the client

---

COMPLAINT FOR PATENT                    -41-
INFRINGEMENT

device to perform an action in order to obtain unrestricted access to the Internet responsive to implementation of one of the plurality of quarantine control function of the client device.

392.    Netskope owns all rights, title, and interest in the '710 Patent.

393.    On November 11, 2024, Netskope notified Fortinet that its products infringe Netskope's Patents.

394.    Despite knowing of its infringement, Fortinet has continued to infringe the '710 patent.

395.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings these claims to stop Fortinet's infringement and recover damages sufficient to compensate Netskope for Fortinet's infringement.

396.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products including but not limited to the following exemplary product: FortiAP.

397.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '710 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to FortiAP.

398.    For example, FortiAP infringes at least claim 1 of the '710 Patent as detailed in Exhibit 11    attached hereto.

399.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiAP, Fortinet has injured Netskope and is liable to Netskope for directly infringing one or more claims of the '710 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

400.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or more claims of the '710 Patent by knowingly and intentionally inducing others, including Fortinet customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

401.    Fortinet, with knowledge that these products, or the use thereof, infringe the '710 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues

1   to knowingly and intentionally induce, direct infringement of the '710 Patent by providing these

2   products to end-users for use in an infringing manner without authority in violation of 35 U.S.C. §

3   271(b).

4       402.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer

5   for sale, or import any products that embody the inventions of the '710 Patent.

6       403.    Fortinet is using the technology claimed in the '710 Patent without paying a

7   reasonable royalty.  As a result of infringement of the '710 Patent by Fortinet, Netskope has

8   suffered monetary damages, and seeks recovery in an amount adequate to compensate for that

9   infringement, but in no event less than a reasonable royalty for the use made of the invention by

10  Fortinet with interest and costs as fixed by the Court.

11      404.    Fortinet is infringing the '710 Patent in a manner best described as willful, deliberate,

12  in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified Fortinet that it

13  infringed the '710 patent on November 11, 2024. Despite that, Fortinet has continued to willfully

14  infringe the '710 patent in bad faith.  Thus, Netskope is entitled to enhanced damages under 35

15  U.S.C. § 284.

16      405.    Fortinet became aware of the '710 Patent no later than approximately November 11,

17  2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its

18  Accused Products within the United States without the authority of Netskope.  By way of example,

19  Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to

20  promote the Accused Products.  Upon information and belief, the Accused Products contain

21  components for use in practicing at least one claim of the '710 Patent that constitute a material part

22  of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that

23  such components are especially made for use in infringing at least one claim of the '710 Patent and

24  are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing

25  actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one

26  claim of the '710 Patent.

27      406.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs

28  and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way

of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation to its customers instructing its customers to perform each element of claim 1, and conditions proper operation of the Fortinet products on performance of each element of claim 1.

407.    Netskope has suffered, and will continue to suffer, irreparable harm as a result of Fortinet's infringement of the '710 Patent for which there is no adequate remedy at law, unless Fortinet's infringement is enjoined by this Court.

## THIRD CLAIM FOR RELIEF

## (Infringement of U.S. Patent No. 8,117,639)

408.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

409.    The '639 Patent contains 4 independent claims, *i.e.*, 1, 10, 17, and 27.  Claim 1 recites:

A method for network access control, comprising:

at a control device, receiving a packet originating from a user device in a first network, wherein the first network is connected to a second network via the control device, and wherein the user device is associated with a user;

processing the packet according to a plurality of stages, including a client discrimination stage and a user specific rule stage;

at the client discrimination stage, extracting information associated with the user device from a header of the packet and associating the packet with user specific traffic control rules and user specific firewall rules; and

at the user specific rule stage, accessing the user specific traffic control rules and user specific firewall rules based on the extracted information associated with the user device and applying the user specific traffic control rules and the user specific firewall rules to the packet as governed by at least one user specific class of service rule associated with the user on the user device in the first network.

410.    Netskope owns all rights, title, and interest in the '639 Patent.

411.    On November 11, 2024, Netskope notified Fortinet that its products infringe Netskope's Patents.

412.    Despite knowing of its infringement, Fortinet has continued to infringe the '639 patent.

1      413.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings

2   these claims to stop Fortinet's infringement and recover damages sufficient to compensate

3   Netskope for Fortinet's infringement.

4      414.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products

5   including but not limited to the following exemplary products: FortiOS and FortiGate.

6      415.    Fortinet has and continues to directly infringe, literally or under the doctrine of

7   equivalents, one or more claims of the '639 Patent by, among other things, making, using, selling,

8   offering for sale, and/or importing into the United States, including but not limited to FortiOS and

9   FortiGate.

10     416.    For example, FortiOS and FortiGate infringe claim 1 of the '639 Patent as detailed

11  in Exhibit 12 attached hereto.

12     417.    By making, using, selling, offering for sale, and/or importing infringing technology

13  products, including but not limited to FortiOS and FortiGate, Fortinet has injured Netskope and is

14  liable to Netskope for directly infringing one or more claims of the '639 Patent, including at least

15  claim 1, pursuant to 35 U.S.C. § 271(a).

16     418.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or

17  more claims of the '639 Patent by knowingly and intentionally inducing others, including Fortinet

18  customers and end-users, to directly infringe, either literally or under the doctrine of equivalents,

19  by making, using, offering to sell, selling, and/or importing into the United States products that

20  include infringing technology.

21     419.    Fortinet, with knowledge that these products, or the use thereof, infringe the '639

22  Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues

23  to knowingly and intentionally induce, direct infringement of the '639 Patent by providing these

24  products to end-users for use in an infringing manner without authority in violation of 35 U.S.C. §

25  271(b).

26     420.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer

27  for sale, or import any products that embody the inventions of the '639 Patent.

28

COMPLAINT FOR PATENT                    -45-
INFRINGEMENT

421.    Fortinet is using the technology claimed in the '639 Patent without paying a reasonable royalty. As a result of infringement of the '639 Patent by Fortinet, Netskope has suffered monetary damages, and seeks recovery in an amount adequate to compensate for that infringement, but in no event less than a reasonable royalty for the use made of the invention by Fortinet with interest and costs as fixed by the Court.

422.    Fortinet is infringing the '639 Patent in a manner best described as willful, deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified Fortinet that it infringed the '639 Patent on November 11, 2024.  Despite that, Fortinet has continued to willfully infringe the '639 Patent in bad faith.  Thus, Netskope is entitled to enhanced damages.

423.    Fortinet became aware of the '639 Patent no later than approximately November 11, 2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its Accused Products within the United States without the authority of Netskope.  By way of example, Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to promote the Accused Products.  Upon information and belief, the Accused Products contain components for use in practicing at least one claim of the '639 Patent that constitute a material part of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that such components are especially made for use in infringing at least one claim of the '639 Patent and are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one claim of the '639 Patent.

424.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation to its customers instructing its customers to perform each element of claim 1, and conditions proper operation of the Fortinet products on performance of each element of claim 1.

425.    Netscope has suffered, and will continue to suffer, irreparable harm as a result of Fortinet's infringement of the '639 Patent for which there is no adequate remedy at law, unless Fortinet's infringement is enjoined by this Court.

**FOURTH CLAIM FOR RELIEF**

**(Infringement of U.S. Patent No. 8,224,983)**

426.    Netscope repeats and re-alleges all the allegations above as if fully set forth herein.

427.    The '983 Patent contains 3 independent claims, i.e., claims 1, 4, and 7.  Claim 1 recites:

A method for allocating network bandwidth to users in a system having an authentication database storing user profiles, an access control device having a plurality of network interfaces coupled to a plurality of user devices and a provisioning device coupled to the access control device, comprising:

configuring the access control device to operate in a first state, wherein operation in the first state comprises regulating network bandwidth usage for a set of users based on a first network bandwidth limit associated with each of the users, and each of the set of users is associated with one of the plurality of user devices;

receiving a first network communication from a first network application running on a first user device coupled to one of the plurality of network interfaces;

accessing a first user profile for a first user associated with the first user device from the authentication database, wherein the first user profile comprises one or more attributes associated with the first user and the first user profile was retrieved from the authentication database based on credentials associated with the first user;

determining a second network bandwidth limit for the first user based on the first network bandwidth limit associated with each of the users and the one or more attributes associated with the first user; and

dynamically updating at least one of the first network bandwidth limits associated with the plurality of users based on the second network bandwidth limit including configuring the access control device to operate in a second state, wherein operation of the access control device in the second state comprises regulating network bandwidth usage for each of the plurality of users based on the first network bandwidth limits.

428.    Netscope owns all rights, title, and interest in the '983 Patent.

429.    On November 11, 2024, Netscope notified Fortinet that its products infringe Netscope's Patents.

430.    Despite knowing of its infringement, Fortinet has continued to infringe the '983 patent.

431.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings these claims to stop Fortinet's infringement and recover damages sufficient to compensate Netskope for Fortinet's infringement.

432.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products including but not limited to the following exemplary product: FortiGate.

433.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '983 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to FortiGate.

434.    For example, FortiGate infringes claim 1 of the '983 Patent as detailed in Exhibit 13 attached hereto.

435.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiGate, Fortinet has injured Netskope and is liable to Netskope for directly infringing one or more claims of the '983 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

436.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or more claims of the '983 Patent by knowingly and intentionally inducing others, including Fortinet customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

437.    Fortinet, with knowledge that these products, or the use thereof, infringe the '983 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '983 Patent by providing these products to end-users for use in an infringing manner without authority in violation of 35 U.S.C. § 271(b).

438.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer for sale, or import any products that embody the inventions of the '983 Patent.

439.    Fortinet is using the technology claimed in the '983 Patent without paying a reasonable royalty.  As a result of infringement of the '983 Patent by Fortinet, Netskope has

suffered monetary damages, and seeks recovery in an amount adequate to compensate for that infringement, but in no event less than a reasonable royalty for the use made of the invention by Fortinet with interest and costs as fixed by the Court.

440.   Fortinet is infringing the '983 Patent in a manner best described as willful, deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified Fortinet that it infringed the '983 Patent on November 11, 2024.  Despite that, Fortinet has continued to willfully infringe the '983 Patent in bad faith.  Thus, Netskope is entitled to enhanced damages.

441.   Fortinet became aware of the '983 Patent no later than approximately November 11, 2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its Accused Products within the United States without the authority of Netskope.  By way of example, Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to promote the Accused Products.  Upon information and belief, the Accused Products contain components for use in practicing at least one claim of the '983 Patent that constitute a material part of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that such components are especially made for use in infringing at least one claim of the '983 Patent and are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one claim of the '983 Patent.

442.   To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation to its customers instructing its customers to perform each element of claim 1, and conditions proper operation of the Fortinet products on performance of each element of claim 1.

443.   Netskope has suffered, and will continue to suffer, irreparable harm as a result of Fortinet's infringement of the '983 Patent for which there is no adequate remedy at law, unless Fortinet's infringement is enjoined by this Court.

1

**FIFTH CLAIM FOR RELIEF**

2

**(Infringement of U.S. Patent No. 8,327,426)**

3      444.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

4      445.    The '426 Patent contains 3 independent claims, i.e., claims 1, 8, and 14.  Claim 1

5  recites:

6      A machine-implemented method to execute on a machine, comprising:

7          receiving, by the machine, an authentication request from a principal, the
   request directed by the principal to an external service and intercepted by the
8  method for receipt;

9          authenticating, by the machine, the principal; and

10          supplying, by the machine, an authentication message for use by an
   identity service on behalf of the principal, the authentication message serves as a
11  new authentication request and as a new authentication response for single sign-
   on access of the principal to the identity service and other services external or
12  internal to the identity service, the identity service acts as a proxy for access
   sessions to the other services on behalf of the principal, the principal's access
13  sessions occur indirectly through the identity service and transparently to the
   principal, wherein the authentication message includes the new authentication
14  request made on behalf of the principal and the authentication message also
   includes a new authentication response that satisfies the new authentication
15  request, that response vouches for authentication of the principal to the identity
   service for the single sign-on access of the principal, the principal believing
16  interactions are with the external service, which is one of the other services that
   the identity service controls access to, and a determination as to whether to use a
17  single interaction or multiple interactions for authentication of the principal to the
   other services is automatically communicated in the new authentication response.

18

19      446.    Netskope owns all rights, title, and interest in the '426 Patent.

20      447.    On November 11, 2024, Netskope notified Fortinet that its products infringe

21  Netskope's Patents.

22      448.    Despite knowing of its infringement, Fortinet has continued to infringe Netskope's

23  Patents.

24      449.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings

25  these claims to stop Fortinet's infringement and recover damages sufficient to compensate

26  Netskope for Fortinet's infringement.

27      450.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products

28  including but not limited to the following exemplary products: FortiGate and FortiAuthenticator.

COMPLAINT FOR PATENT
INFRINGEMENT                                    -50-

451.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '426 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to FortiAuthenticator and FortiCASB.

452.    For example, FortiAuthenticator and FortiCASB infringes claim 1 of the '426 Patent as detailed in Exhibit 14 attached hereto.

453.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiAuthenticator and FortiCASB, Fortinet has injured Netskope and is liable to Netskope for directly infringing one or more claims of the '426 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

454.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or more claims of the '426 Patent by knowingly and intentionally inducing others, including Fortinet customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

455.    Fortinet, with knowledge that these products, or the use thereof, infringe the '426 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '426 Patent by providing these products to end-users for use in an infringing manner without authority in violation of 35 U.S.C. § 271(b).

456.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer for sale, or import any products that embody the inventions of the '426 Patent.

457.    Fortinet is using the technology claimed in the '426 Patent without paying a reasonable royalty.  As a result of infringement of the '426 Patent by Fortinet, Netskope has suffered monetary damages, and seeks recovery in an amount adequate to compensate for that infringement, but in no event less than a reasonable royalty for the use made of the invention by Fortinet with interest and costs as fixed by the Court.

458.    Fortinet is infringing the '426 Patent in a manner best described as willful, deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified Fortinet that it infringed the '426 patent on November 11, 2024.  Despite that, Fortinet has continued to willfully infringe the '426 patent in bad faith.  Thus, Netskope is entitled to enhanced damages.

459.    Fortinet became aware of the '426 Patent no later than approximately November 11, 2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its Accused Products within the United States without the authority of Netskope.  By way of example, Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to promote the Accused Products.  Upon information and belief, the Accused Products contain components for use in practicing at least one claim of the '426 Patent that constitute a material part of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that such components are especially made for use in infringing at least one claim of the '426 Patent and are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one claim of the '426 Patent.

460.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation to its customers instructing its customers to perform each element of claim 1, and conditions proper operation of the Fortinet products on performance of each element of claim 1.

461.    Netskope has suffered, and will continue to suffer, irreparable harm as a result of Fortinet's infringement of the '426 Patent for which there is no adequate remedy at law, unless Fortinet's infringement is enjoined by this Court.

## SIXTH CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 7,593,936)

462.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

463.    The '936 Patent contains 2 independent claims, i.e., claims 1 and 12.    Claim 1 recites:

A method of detecting abnormal system states in computers, comprising:

receiving snapshots from a plurality of computers within a population of computers, wherein individual snapshots include data indicating a state of a respective computer;

automatically generating an adaptive reference model comprising a rule set customized to characteristics of the population of computers, the rule set being developed by identifying patterns among the snapshots from the plurality of computers such that the adaptive reference model is indicative of normal states in the computers within the population; and

comparing a snapshot from at least one of the computers to the adaptive reference model to determine whether an anomaly is present in the state of the at least one of the computers.

464.    Netskope owns all rights, title, and interest in the '936 Patent.

465.    On November 11, 2024, Netskope notified Fortinet that its products infringe Netskope's Patents.

466.    Despite knowing of its infringement, Fortinet has continued to infringe Netskope's Patents.

467.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings these claims to stop Fortinet's infringement and recover damages sufficient to compensate Netskope for Fortinet's infringement.

468.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products including but not limited to the following exemplary products: FortiAuthenticator.

469.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '936 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to FortiAuthenticator.

470.    For example, FortiAuthenticator infringes claim 1 of the '936 Patent as detailed in Exhibit 15 attached hereto.

471.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiAuthenticator, Fortinet has injured Netskope and is liable

1    to Netskope for directly infringing one or more claims of the '936 Patent, including at least claim

2    1, pursuant to 35 U.S.C. § 271(a).

3         472.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or

4    more claims of the '936 Patent by knowingly and intentionally inducing others, including Fortinet

5    customers and end-users, to directly infringe, either literally or under the doctrine of equivalents,

6    by making, using, offering to sell, selling, and/or importing into the United States products that

7    include infringing technology.

8         473.    Fortinet, with knowledge that these products, or the use thereof, infringe the

9    '936 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and

10   continues to knowingly and intentionally induce, direct infringement of the '936 Patent by

11   providing these products to end-users for use in an infringing manner without authority in violation

12   of 35 U.S.C. § 271(b).

13        474.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer

14   for sale, or import any products that embody the inventions of the '936 Patent.

15        475.    Fortinet is using the technology claimed in the '936 Patent without paying a

16   reasonable royalty.  As a result of infringement of the '936 Patent by Fortinet, Netskope has

17   suffered monetary damages, and seeks recovery in an amount adequate to compensate for that

18   infringement, but in no event less than a reasonable royalty for the use made of the invention by

19   Fortinet with interest and costs as fixed by the Court.

20        476.    Fortinet is infringing the '936 Patent in a manner best described as willful,

21   deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified

22   Fortinet that it infringed the '936 Patent on November 11, 2024.  Despite that, Fortinet has

23   continued to willfully infringe the '936 Patent in bad faith.  Thus, Netskope is entitled to enhanced

24   damages.

25        477.    Fortinet became aware of the '936 Patent no later than approximately November 11,

26   2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its

27   Accused Products within the United States without the authority of Netskope.  By way of example,

28   Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to

promote the Accused Products.  Upon information and belief, the Accused Products contain components for use in practicing at least one claim of the '936 Patent that constitute a material part of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that such components are especially made for use in infringing at least one claim of the '936 Patent and are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one claim of the '936 Patent.

478.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs and controls the performance of those elements by third parties (e.g., Fortinet customers).  By way of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation to its customers instructing its customers to perform each element of claim 1, and conditions proper operation of the Fortinet products on performance of each element of claim 1.

479.    Netskope has suffered, and will continue to suffer, irreparable harm as a result of Fortinet's infringement of the '936 Patent for which there is no adequate remedy at law, unless Fortinet's infringement is enjoined by this Court.

## SEVENTH CLAIM FOR RELIEF

## (Infringement of U.S. Patent No. 8,397,282)

480.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

481.    The '282 Patent contains 3 independent claims, i.e., claims 1, 12, and 24.  Claim 1 recites:

A method for controlling data through a firewall performed on at least one data controlling computer having computer instructions stored on at least one non-transitory computer readable medium, comprising:

defining at least one node, wherein the at least one node is associated with two or more network interfaces;

associating a set of firewall rules with the at least one node;

receiving a packet at a first node of the at least one node; and

accepting or denying the packet based on the set of firewall rules, wherein the set of firewall rules is dynamically self-configurable during runtime without operator interaction, wherein the set of firewall rules comprises a plurality of chains of rules forming various paths through a hierarchical structure, and wherein

the hierarchical structure comprises defined places for dynamically updating the set of firewall rules during runtime.

482.    Netskope owns all rights, title, and interest in the '282 Patent.

483.    On November 11, 2024, Netskope notified Fortinet that its products infringe Netskope's Patents.

484.    Despite knowing of its infringement, Fortinet has continued to infringe Netskope's Patents.

485.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings these claims to stop Fortinet's infringement and recover damages sufficient to compensate Netskope for Fortinet's infringement.

486.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products including but not limited to the following exemplary products: FortiGate.

487.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '282 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to FortiGate.

488.    For example, FortiGate infringes claim 1 of the '282 Patent as detailed in Exhibit 16 attached hereto.

489.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiGate, Fortinet has injured Netskope and is liable to Netskope for directly infringing one or more claims of the '282 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

490.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or more claims of the '282 Patent by knowingly and intentionally inducing others, including Fortinet customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

491.    Fortinet, with knowledge that these products, or the use thereof, infringe the '282 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and

1    continues to knowingly and intentionally induce, direct infringement of the '282 Patent by

2    providing these products to end-users for use in an infringing manner without authority in violation

3    of 35 U.S.C. § 271(b).

4        492.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer

5    for sale, or import any products that embody the inventions of the '282 Patent.

6        493.    Fortinet is using the technology claimed in the '282 Patent without paying a

7    reasonable royalty.  As a result of infringement of the '282 Patent by Fortinet, Netskope has

8    suffered monetary damages, and seeks recovery in an amount adequate to compensate for that

9    infringement, but in no event less than a reasonable royalty for the use made of the invention by

10   Fortinet with interest and costs as fixed by the Court.

11       494.    Fortinet is infringing the '282 Patent in a manner best described as willful,

12   deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified

13   Fortinet that it infringed the '282 Patent on November 11, 2024.  Despite that, Fortinet has

14   continued to willfully infringe the '282 Patent in bad faith.  Thus, Netskope is entitled to enhanced

15   damages.

16       495.    Fortinet became aware of the '282 Patent no later than approximately November 11,

17   2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its

18   Accused Products within the United States without the authority of Netskope.  By way of example,

19   Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to

20   promote the Accused Products.  Upon information and belief, the Accused Products contain

21   components for use in practicing at least one claim of the '282 Patent that constitute a material part

22   of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that

23   such components are especially made for use in infringing at least one claim of the '282 Patent and

24   are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing

25   actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one

26   claim of the '282 Patent.

27       496.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs

28   and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way

1    of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation

2    to its customers instructing its customers to perform each element of claim 1, and conditions proper

3    operation of the Fortinet products on performance of each element of claim 1.

4        497.    Netskope has suffered, and will continue to suffer, irreparable harm as a result of

5    Fortinet's infringement of the '282 Patent for which there is no adequate remedy at law, unless

6    Fortinet's infringement is enjoined by this Court.

7                              **EIGHTH CLAIM FOR RELIEF**

8                         **(Infringement of U.S. Patent No. 8,661,153)**

9        498.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

10       499.    The '153 Patent contains 3 independent claims, i.e., claims 1, 10, and 15.  Claim 1

11   recites:

12   A method executing on a control device for allocating network bandwidth to users
13   accessing a first network, comprising:

14       in response to a first user of the users connecting to said control device
15   using a user device on a second network, obtaining a user bandwidth allocation
     profile for said first user based on user credentials, wherein said first user is a
16   human user wherein said user bandwidth allocation profile is stored local or
     remote to said control device, wherein the user bandwidth allocation profile
17   contains an arbitrary number of attributes specifying bandwidth limitations for the
     first user, and wherein said control device is located between said user device and
18   said first network, said control device capable of dynamically altering bandwidth
     allocations among a set of users on said second network;

19       based on the arbitrary number of attributes in each user profile, establishing
20   user specific rules and conditions that are bound to the first user during a control
     session based on the user device associated with the first user and the first
21   credentials provided by the first user for the control session wherein the user
     specific rules include at least one network bandwidth limit for the first user;

22       obtaining information identifying said user device used by said first user on
23   said second network to connect to said control device for accessing said first
24   network;

25       associating said at least one traffic control rule with said first user based on
     said user credentials and considering said information identifying said user device
26   used by said first user on said second network to connect to said control device for
     accessing said first network; and

27       dynamically updating the network bandwidth for said first user utilizing
28   said at least one traffic control rule associated with said first user.

COMPLAINT FOR PATENT                    -58-
INFRINGEMENT

1      500.    Netskope owns all rights, title, and interest in the '153 Patent.

501.    On November 11, 2024, Netskope notified Fortinet that its products infringe Netskope's Patents.

502.    Despite knowing of its infringement, Fortinet has continued to infringe Netskope's Patents.

503.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings these claims to stop Fortinet's infringement and recover damages sufficient to compensate Netskope for Fortinet's infringement.

504.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products including but not limited to the following exemplary products: FortiGate.

505.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '153 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to FortiGate.

506.    For example, FortiGate infringes claim 1 of the '153 Patent as detailed in Exhibit 17 attached hereto.

507.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiGate, Fortinet has injured Netskope and is liable to Netskope for directly infringing one or more claims of the '153 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

508.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or more claims of the '153 Patent by knowingly and intentionally inducing others, including Fortinet customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

509.    Fortinet, with knowledge that these products, or the use thereof, infringe the '153 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '153 Patent by

1  providing these products to end-users for use in an infringing manner without authority in violation

2  of 35 U.S.C. § 271(b).

3      510.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer

4  for sale, or import any products that embody the inventions of the '153 Patent.

5      511.    Fortinet is using the technology claimed in the '153 Patent without paying a

6  reasonable royalty.  As a result of infringement of the '153 Patent by Fortinet, Netskope has

7  suffered monetary damages, and seeks recovery in an amount adequate to compensate for that

8  infringement, but in no event less than a reasonable royalty for the use made of the invention by

9  Fortinet with interest and costs as fixed by the Court.

10     512.    Fortinet is infringing the '153 Patent in a manner best described as willful,

11 deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified

12 Fortinet that it infringed the '153 Patent on November 11, 2024.  Despite that, Fortinet has

13 continued to willfully infringe the '153 Patent in bad faith.  Thus, Netskope is entitled to enhanced

14 damages.

15     513.    Fortinet became aware of the '153 Patent no later than approximately November 11,

16 2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its

17 Accused Products within the United States without the authority of Netskope.  By way of example,

18 Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to

19 promote the Accused Products.  Upon information and belief, the Accused Products contain

20 components for use in practicing at least one claim of the '153 Patent that constitute a material part

21 of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that

22 such components are especially made for use in infringing at least one claim of the '153 Patent and

23 are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing

24 actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one

25 claim of the '153 Patent.

26     514.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs

27 and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way

28 of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation

to its customers instructing its customers to perform each element of claim 1, and conditions proper operation of the Fortinet products on performance of each element of claim 1.

515.    Netskope has suffered, and will continue to suffer, irreparable harm as a result of Fortinet's infringement of the '153 Patent for which there is no adequate remedy at law, unless Fortinet's infringement is enjoined by this Court.

## NINTH CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 8,635,697)

516.    Netskope repeats and re-alleges all the allegations above as if fully set forth herein.

517.    The '697 Patent contains 3 independent claims, i.e., claims 1, 15, and 24.  Claim 1 recites:

A method of network based malware detection in a service provider network, the method comprising:

receiving one or more transmission control protocol (TCP) packets originating from an access device coupled to the service provider network, the one or more TCP packets

defining a TCP session between a computing device coupled to the access device, and a destination coupled to the service provider network;

determining an operating system identifier (OS ID) associated with the TCP session and the computing device;

determining if malware is present in the TCP session and an associated malware ID by comparing a malware signature to the one or more TCP packets; and

generating an alert identifying a network address associated with the access device, the malware ID and the OS ID associated with TCP session that generated the alert.

518.    Netskope owns all rights, title, and interest in the '697 Patent.

519.    On November 11, 2024, Netskope notified Fortinet that its products infringe Netskope's Patents.

520.    Despite knowing of its infringement, Fortinet has continued to infringe Netskope's Patents.

521.    Given Fortinet's past infringement and refusal to stop infringing, Netskope brings these claims to stop Fortinet's infringement and recover damages sufficient to compensate Netskope for Fortinet's infringement.

522.    Fortinet makes, uses, sells, offers for sale, and/or imports technology products including but not limited to the following exemplary products: FortiGate and FortiCASB.

523.    Fortinet has and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '697 Patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States, including but not limited to FortiGate and FortiCASB.

524.    For example, FortiGate infringes claim 1 of the '697 Patent as detailed in Exhibit 18 attached hereto.

525.    By making, using, selling, offering for sale, and/or importing infringing technology products, including but not limited to FortiGate and FortiCASB, Fortinet has injured Netskope and is liable to Netskope for directly infringing one or more claims of the '697 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

526.    Fortinet has and continues to indirectly infringe under 35 U.S.C. § 271(b) one or more claims of the '697 Patent by knowingly and intentionally inducing others, including Fortinet customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

527.    Fortinet, with knowledge that these products, or the use thereof, infringe the '697 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '697 Patent by providing these products to end-users for use in an infringing manner without authority in violation of 35 U.S.C. § 271(b).

528.    Netskope has not licensed or otherwise authorized Fortinet to make, use, sell, offer for sale, or import any products that embody the inventions of the '697 Patent.

529.    Fortinet is using the technology claimed in the '697 Patent without paying a reasonable royalty.  As a result of infringement of the '697 Patent by Fortinet, Netskope has suffered monetary damages, and seeks recovery in an amount adequate to compensate for that

1   infringement, but in no event less than a reasonable royalty for the use made of the invention by

2   Fortinet with interest and costs as fixed by the Court.

3        530.    Fortinet is infringing the '697 Patent in a manner best described as willful,

4   deliberate, in bad faith, consciously wrongful, and flagrant.  For example, Netskope notified

5   Fortinet that it infringed the '697 Patent on November 11, 2024.  Despite that, Fortinet has

6   continued to willfully infringe the '697 Patent in bad faith.  Thus, Netskope is entitled to enhanced

7   damages.

8        531.    Fortinet became aware of the '697 Patent no later than approximately November 11,

9   2024.  Upon information and belief, as explained above, Fortinet has offered for sale or sold its

10   Accused Products within the United States without the authority of Netskope.  By way of example,

11   Fortinet offers its products for sale in the United States and partners with U.S.-based retailers to

12   promote the Accused Products.  Upon information and belief, the Accused Products contain

13   components for use in practicing at least one claim of the '697 Patent that constitute a material part

14   of the inventions claimed therein.  Fortinet has done so while knowing, with specific intent, that

15   such components are especially made for use in infringing at least one claim of the '697 Patent and

16   are not a staple article or commodity suitable for substantial non-infringing use.  The foregoing

17   actions by Fortinet constitute contributory infringement under 35 U.S.C. § 271(c) of at least one

18   claim of the '697 Patent.

19        532.    To the extent that Fortinet does not perform all elements of claim 1, Fortinet directs

20   and controls the performance of those elements by third-parties (e.g., Fortinet customers).  By way

21   of example, as indicated in the materials cited in Exhibits 10-18, Fortinet provides documentation

22   to its customers instructing its customers to perform each element of claim 1, and conditions proper

23   operation of the Fortinet products on performance of each element of claim 1.

24        533.    Netskope has suffered, and will continue to suffer, irreparable harm as a result of

25   Fortinet's infringement of the '697 Patent for which there is no adequate remedy at law, unless

26   Fortinet's infringement is enjoined by this Court.

27                    **PRAYER FOR RELIEF**

28        Netskope respectfully requests the following relief:

COMPLAINT FOR PATENT INFRINGEMENT      -63-

A.      That Defendant has infringed each of Netskope's Patents in violation of 35 U.S.C. § 271;

B.      Awarding Netskope its damages suffered as a result of Fortinet's infringement, including but not limited to Fortinet's profits, Netskope's actual damages, enhanced damages, exemplary damages, costs, prejudgment and post-judgment interest, and reasonable attorney fees;

C.      Trebling Netskope's damages from Fortinet due to willfulness;

D.      Enjoining further wrongful acts by Fortinet that would further irreparably injure Netskope's intellectual property;

E.      A judgment and order requiring Defendant to provide accountings and to pay supplemental damages to Plaintiff, including, without limitation, prejudgment and post-judgment interest; and

F.      That the Court declare that this case is exceptional under 35 U.S.C. § 285 and award Netskope its attorneys' fees, costs, and expenses incurred in this action;

G.      That the Court award Netskope any and all other relief to which Netskope may show itself to be entitled; and

H.      That the Court award Netskope any other relief as the Court may deem just, equitable, and proper.

## JURY DEMAND

Netskope hereby demands a jury trial on all issues and claims so triable.

DATED: March 7, 2025                        **PERKINS COIE LLP**


By: */s/ Thomas N. Millikan*
        Thomas N. Millikan, Bar No. 234430
        TMillikan@perkinscoie.com
        Joseph P. Reid, Bar No. 211082
        JReid@perkinscoie.com
        Andrew N. Klein, Bar No. 300221
        AKlein@perkinscoie.com

        Attorneys for Plaintiff
        Netskope, Inc.