UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETSKOPE, INC.,<br>Plaintiff,<br>v.<br>FORTINET, INC.,<br>Defendant. | Case No. 25-cv-02360-HSG<br>**CLAIM CONSTRUCTION ORDER**<br>Re: Dkt. No. 123 |

On March 7, 2025, Plaintiff Netskope, Inc. filed this action against Defendant Fortinet, Inc. for patent infringement. Dkt. No. 1. The parties now seek construction of eight terms found in six of the asserted patents. This order follows claim construction briefing and a hearing. Dkt. No. 123 ("Netskope Br."); Dkt. No. 130 ("Fortinet Br."); Dkt. No. 132 ("Reply Br."); Dkt. No. 141 ("Joint Statement"); Dkt. No. 146 ("Hr'g Tr.").

## I. BACKGROUND

This claim construction dispute involves six asserted patents: U.S. Patent No. 8,356,336 (the "'336 Patent"), U.S. Patent No. 8,543,710 (the "'710 Patent"), U.S. Patent No. 8,327,426 (the "'426 Patent"), U.S. Patent No. 7,593,936 (the "'936 Patent"), U.S. Patent No. 8,661,153 (the "'153 Patent"), and U.S. Patent No. 8,635,697 (the "'697 Patent"). The complaint also alleges infringement of U.S. Patent No. 8,117,639 (the "'693 Patent"), U.S. Patent No. 8,224,983 (the "'983 Patent"), and U.S. Patent No. 8,397,282 (the "'282 Patent"). Netskope agreed to dismiss all of its asserted claims from the '282 Patent without prejudice, Dkt. No. 120 at 2, and does not seek construction of claims from the '983 Patent or '693 Patent. Joint Statement at 2. The patents relate to various data security and firewall inventions.

The accused products are Fortinet's FortiGate ('336, '710, '153 Patents), FortiAP ('336, '710 Patents), FortiOS ('639, '697 Patents), FortiAuthenticator ('426 Patent), FortiWeb Cloud

('936 Patent), and FortiEDR ('936 Patent). *See* Dkt. No. 29.

**A. The '336 Patent**

The '336 Patent is entitled "System and Method for Double-Capture/Double-Redirect to a Different Location" and issued on February 16, 2010. Dkt. No. 29-1 at 2 ("'336 Patent").

The '336 Patent has three independent claims—claims 1, 9, and 16. Claim 1 recites:

> A method for automatic pre-authentication redirection of network traffic, comprising:
>
> providing a network access controller in a shared network, wherein the shared network comprises a plurality of server computers and a set of network destinations hosted on the plurality of server computers;
>
> intercepting at the network access controller a request to access a network resource from a browser application running on a client device within the shared network associated with an anonymous user;
>
> determining whether the network resource referenced in the request is in the set of network destinations hosted on the plurality of server computers in the shared network;
>
> if the network resource is in the set of network destinations hosted on the plurality of server computers in the shared network, directing the browser application running on the client device within the shared network associated with the anonymous user to the network resource; and
>
> if the network resource is not in the set of network destinations hosted on the plurality of server computers in the shared network, redirecting the browser application running on the client device within the shared network associated with the anonymous user to a pre-authentication capture destination hosted on a first server computer, wherein the first server computer is one of the plurality of server computers in the shared network and wherein from the pre-authentication capture destination the anonymous user is free to visit any of the set of network destinations hosted on the plurality of server computers in the shared network without authentication.

'336 Patent, cl. 1. Dependent claims 2–8 recite additional limitations. Independent claim 9 recites requirements for a computer program that intercepts at the network access controller and determines which resources are available to the user. *Id.*, cl. 9. Independent claim 16 recites requirements for an "apparatus for controlling network access" or the network access controller. The apparatus must comprise "a processor within a shared network" and the computer program explained in independent claim 9. *Id.,* cl. 16.



United States District Court
Northern District of California

### B. The ’710 Patent

The ’710 Patent is entitled “Method and System for Controlling Network Access” and issued on September 24, 2013. Dkt. No. 29-2 at 2 (“’710 Patent”). The patent describes a method of containing a device’s network access through walled gardens. The ’710 Patent has three independent claims—claims 1, 8, and 15. While claims 1, 6, 8, 13, 15, and 20 are at issue in the claim construction, the disputed terms are captured by Claim 1:

> A method of network traffic quarantine control, comprising:
>
> at a network access gateway device between a local network and the Internet, selecting a client device in a first network segment of the network;
>
> at the network access gateway device, performing a plurality of quarantine control functions over the client device, wherein the plurality of quarantine control functions comprises:
>
> a) restricting all network traffic emanating from the client device to one or more network destination addresses that are not in or subordinate to the first network segment;
>
> b) restricting all network traffic emanating from the client device to an allowed network destination address to selected one or more network protocols; and
>
> rendering a web page to display on the client device from the network access gateway device, wherein the web page contains an offer for a user of the client device to perform an action in order to obtain unrestricted access to the Internet responsive to implementation of one of the plurality of quarantine control function of the client device.

’710 Patent, cl 1. Independent claim 8 recites requirements for a computer program product to perform quarantine functions. *id.*, cl. 8, and independent claim 15 recites requirements for a network access device comprising at least one processor and a non-transitory computer readable medium with instructions to perform quarantine functions. *Id.*, cl. 15.

### C. The ’426 Patent

The ’426 Patent is entitled “Single Sign On with Proxy Service” and issued on December 4, 2012. Dkt. No. 29-5 at 2 (“’426 Patent”). The patent describes a service where a successful authentication with one service is used to authenticate the principal with another service. *Id.*

The ’426 Patent has three independent claims—1, 8 and 14. Claim 1 is the relevant claim to this dispute:

> A machine-implemented method to execute on a machine, comprising:
>
> receiving, by the machine, an authentication request from a principal, the request directed by the principal to an external service and intercepted by the method for receipt;
>
> authenticating, by the machine, the principal; and
>
> supplying, by the machine, an authentication message for use by an identity service on behalf of the principal, the authentication message serves as a new authentication request and as a new authentication response for single sign-on access of the principal to the identity service and other services external or internal to the identity service, the identity service acts as a proxy for access sessions to the other services on behalf of the principal, the principal's access sessions occur indirectly through the identity service and transparently to the principal, wherein the authentication message includes the new authentication request made on behalf of the principal and the authentication message also includes a new authentication response that satisfies the new authentication request, that response vouches for authentication of the principal to the identity service for the single sign-on access of the principal, the principal believing interactions are with the external service, which is one of the other services that the identity service controls access to, and a determination as to whether to use a single interaction or multiple interactions for authentication of the principal to the other services is automatically communicated in the new authentication response.

’426 Patent, cl. 1.

### D. The ’936 Patent

The ’936 Patent is entitled “Systems and Methods for Automated Computer Support” and issued on September 22, 2009. Dkt. No. 29-6 at 2 (“’936 Patent”). The ’936 Patent describes systems and methods for automated computer support where a computer agent or machine makes decisions and starts corrective actions. *Id.* at 3:34–61.

The ’936 Patent has two independent claims—claims 1 and 12—both of which contain the term subject of construction: “snapshot.” Claim 1 recites:

> A method of detecting abnormal system states in computers, comprising:
>
> receiving snapshots from a plurality of computers within a population of computers, wherein individual snapshots include data indicating a state of a respective computer;
>
> automatically generating an adaptive reference model comprising a rule set customized to characteristics of the



United States District Court
Northern District of California

> population of computers, the rule set being developed by identifying patterns among the snapshots from the plurality of computers such that the adaptive reference model is indicative of normal states in the computers within the population; and
>
> comparing a snapshot from at least one of the computers to the adaptive reference model to determine whether an anomaly is present in the state of the at least one of the computers.

’936 Patent, cl 1. The only difference between claim 1 and 12 is the preamble, with claim 12 reciting “[a] computer readable medium storing instructions, that when executed by a computer, cause the computer to perform functions of. . . .” *Id.*, cl 12.

### E. The ’153 Patent

The ’153 Patent is entitled “System and Method for Dynamic Bandwidth Provisioning” and issued on February 25, 2014. Dkt. No. 29-8 at 2 (“’153 Patent”). When organizations provide internet access through a router connected to a single local area network (“LAN”), bandwidth is typically provisioned by router. *Id.* at 1:37–41. As such, a single user could consume a disproportionate share of the router’s capabilities. *Id.* at 1:37–2:2. The ’153 Patent proposes a solution where bandwidth is provisioned by user rather than by router through a process where the invention first identifies the user, then establishing specific traffic rules for that user. *Id.* at 2:3–11. When the user’s requests exceed their bandwidth limits, those communications are either queued or dropped rather than allowed to pass through. *See id.* at 5:1–12, 6:60–7:4.

The ’153 Patent contains three independent claims—claims 1, 10, and 15—all of which contain the same phrase subject to construction (“arbitrary number of attributes”). Claim 1 recites:

> A method executing on a control device for allocating network bandwidth to users accessing a first network, comprising:
>
> in response to a first user of the users connecting to said control device using a user device on a second network, obtaining a user bandwidth allocation profile for said first user based on user credentials, wherein said first user is a human user wherein said user bandwidth allocation profile is stored local or remote to said control device, wherein the user bandwidth allocation profile contains an arbitrary number of attributes specifying bandwidth limitations for the first user, and wherein said control device is located between said user device and said first network, said control device capable of dynamically altering bandwidth allocations among a set of users on said second network;
>
> based on the arbitrary number of attributes in each user

> profile, establishing user specific rules and conditions that are bound to the first user during a control session based on the user device associated with the first user and the first credentials provided by the first user for the control session wherein the user specific rules include at least one network bandwidth limit for the first user;
>
> obtaining information identifying said user device used by said first user on said second network to connect to said control device for accessing said first network;
>
> associating said at least one traffic control rule with said first user based on said user credentials and considering said information identifying said user device used by said first user on said second network to connect to said control device for accessing said first network; and
>
> dynamically updating the network bandwidth for said first user utilizing said at least one traffic control rule associated with said first user.

*Id.*, cl. 1. Independent claim 10 recites requirements for a computer program product and independent claim 15 recites requirements for a system for allocating network bandwidth. *Id.*, cls. 10, 15.

**F. The ’697 Patent**

The ’697 Patent is entitled “Method and System for Operating System Identification in a Network Based Security Monitoring Solution” and issued on January 21, 2014. Dkt. No. 29-9 at 2 (“’697 Patent”). The patent claims an invention that first determines whether a packet contains malware, then identifies the operating system of the computer generating the packet with malware, which in combination with the IP address facilitates targeted remediation. *Id.* at 1:53–67. The ’697 Patent includes three independent claims—claims 1, 15, and 24—all of which are at issue.

Claim 1 recites:

> A method of network based malware detection in a service provider network, the method comprising:
>
> > receiving one or more transmission control protocol (TCP) packets originating from an access device coupled to the service provider network, the one or more TCP packets defining a TCP session between a computing device coupled to the access device, and a destination coupled to the service provider network;
> >
> > determining an operating system identifier (OS ID) associated with the TCP session and the computing device;
> >
> > determining if malware is present in the TCP session and an associated malware ID by comparing a malware signature to

> the one or more TCP packets; and
>
> generating an alert identifying a network address associated with the access device, the malware ID and the OS ID associated with TCP session that generated the alert.

*Id.*, cl 1. Independent claim 15 recites a system for network based malware detection in a service provider network and independent claim 24 recites a computer readable memory containing instructions for network based malware detection in a service provider network. *Id.*, cls. 15, 24.

## II. LEGAL STANDARD

### A. Claim Construction

Claim construction is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation omitted). It is "a basic principle of claim construction . . . that 'the words of a claim are generally given their ordinary and customary meaning.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed Cir. 2005)). Because the claims "do not stand alone," they "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (internal quotation omitted). Thus, the ordinary and customary meaning of a claim term is "not the meaning of the term in the abstract," but rather "its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321; *see also Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1042 (Fed. Cir. 2019) ("Claim construction seeks to ascribe to claim terms the meaning a person of ordinary skill in the art at the time of invention would have given them."); *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) ("Claim construction requires a determination as to how a person of ordinary skill in the art would understand a claim term in the context of the entire patent, including the specification." (internal quotation omitted)). There are only two circumstances where a claim is not entitled to its plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d

United States District Court
Northern District of California

1362, 1365 (Fed. Cir. 2012).

In determining the ordinary and customary meaning, the claim language "provide[s] substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Additionally, "the context in which a claim term is used in the asserted claim can be highly instructive." *Id*. However, a person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313. The specification "is always highly relevant to the claim construction analysis" and is usually "dispositive." *Id*. at 1315. The scope of the claims must be "determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id*. at 1316 (quotation omitted). Thus, the construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id*.

In addition to the claims and the specification, the prosecution history may be used "to provide[ ] evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described and patented." *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (quotation omitted). The claims, specification, and prosecution history together constitute the "intrinsic evidence" that forms the primary basis for claim construction. *Phillips*, 415 F.3d at 1312–17 (citation omitted).

Courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert opinions, if it is "helpful in determining the 'true meaning of language used in the patent claims'" and is not contradicted by the intrinsic evidence. *Id.* at 1318 (quoting *Markman*, 52 F.3d at 980). For example, dictionaries may reveal what the ordinary and customary meaning of a term would have been to a person of ordinary skill in the art at the time of the invention. *Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*, 744 F.3d 715, 722 (Fed. Cir. 2014) ("Terms generally carry their ordinary and customary meaning in the relevant field at the relevant time, as shown by reliable sources such as dictionaries, but they always must be understood in the context

of the whole document—in particular, the specification (along with the prosecution history, if pertinent)"). Expert testimony can also help "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Extrinsic evidence is, however, "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (quotation omitted).

**B. Indefiniteness**

Indefiniteness occurs when the "claims, read in light of the specification . . . and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instr., Inc.*, 572 U.S. 898, 901 (2014); *see* 35 U.S.C. § 112 ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains…"). "'Reasonable certainty' does not require 'absolute or mathematical precision,'" *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (quoting *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015)), but the party making an indefiniteness claim must support it with "clear and convincing evidence." *BASF Corp.*, 875 F.3d at 1365.

**C. Agreed Constructions and POSITA Definition**

The parties identified ten disputed terms, which were narrowed to eight by agreement. Dkt. No. 147 at 2. The parties also agree that the person of skill in the art ("POSITA") for each of the patents at issue has "a B.S. in computer science, computer engineering, or electrical engineering (or equivalent) and at least two years' experience in computer networking and security." Netskope Br. at 7; Fortinet Br. at 5–6.[1]

## III. DISCUSSION

The parties dispute constructions for eight terms across six patents. Netskope takes the

[1] For ease of reference, the Court refers to the PDF pages rather than the document's internal pagination unless otherwise noted.

United States District Court
Northern District of California

position that all the terms must be given their plain and ordinary meaning. Fortinet proposes constructions that narrow the scope of each claim, including challenging three terms as indefinite.

### A. ’336 Patent

The ’336 Patent describes an invention enabling an unauthenticated user to access a set of servers (the “Walled Garden”) through a network access controller, but limiting access to specific content contained on those servers. *See* ’336 Patent at 4:50–5:6. For example, a business with a public network may allow an end user to see only certain pages within the Walled Garden until the user is authenticated by registering with the business. *Id.* at 1:34–54. If an unauthenticated user seeks to open a page outside of the Walled Garden, they are diverted to a webpage within the Walled Garden. *See, e.g., id.*, cl. 1, 9, 16. Once the user is authenticated, they may access the internet without restrictions. *See, e.g., id.* at 5:7–29.

#### i. “shared network” (’336 Patent, claims 1–2, 4, 6–9, 11 13–17, 20)

| Netskope’s Proposed Construction | Fortinet’s Proposed Construction |
|---|---|
| Plain and ordinary meaning | “a local network to which an unauthenticated user has access” |

The parties have two disputes regarding this term: first, whether only “unauthenticated users,” and not authenticated users, have access to the shared network; and second, whether the “shared network” must be a local network.

Netskope contends that Fortinet’s proposed construction is inaccurate because it indicates that only unauthenticated users may access the shared network. Netskope Br. at 8–9. Fortinet responds that the inclusion of “an unauthenticated user” in its proposed construction is not intended to limit access to the Walled Garden only to unauthenticated users, Fortinet Br. at 10 n.2, but it does not propose any amendment to its construction. The Court finds that the plain meaning of Fortinet’s construction would provide that authenticated users could not access the shared network, and the parties agree that reading is not supported by the patent. Netskope Br. at 8; Fortinet Br. at 7.

The more substantial dispute between the parties is whether the shared network must be local. Fortinet argues that “shared network” can only be understood within the context of the

Walled Garden being a local network environment. Fortinet Br. at 7. That shared network "is both[sic] comprised of local computers accessible by unauthenticated users, in addition to authenticated users." *Id*. at 7. Netskope contends that nothing in the plain language requires the shared network to be local.

The plain language, which does not indicate that the servers comprising the shared network must be local to the user, favors Netskope. *See* '336 Patent, claim 1 ("the shared network comprises a plurality of server computers and a set of network destinations hosted on the plurality of server computers."). Fortinet contends that the claim distinguishes the shared network (which the client device must be "within") from external webpages, Fortinet Br. at 7–8, but this argument is not persuasive. The patent distinguishes the external webpages from a "set of network destinations," *see* '336 Patent, claim 1, but does not indicate that those destinations must be local.

Fortinet defends its construction using the background section of the specification and the description of the embodiment that references a "Web server for the mall" and an "on-site customer." Fortinet Br. at 7 (citing '336 Patent at 1:26–47, 4:55-5:6). The relevant section references "Web sites that are associated with the mall (e.g., the local Web server for a tenant in the mall, such as a department store or movie theater)." '336 Patent at 1:42–44. But this illustration is exemplary, and it is generally inappropriate to restrict the meaning of a claim when the plain language does not include those limitations. *Phillips*, 415 F.3d at 1323. The reference to accessing a "local Web server for a tenant in the mall" includes the disclaimer that it is only an "example." '336 Patent at 1:42–44.

Fortinet further conflates separate components in the patent. *See* Reply Br. at 6 (citing '336 Patent at 4:55–58). The network access controller has an internal firewall, which restricts an unauthenticated user from accessing websites outside of the Walled Garden. '336 Patent at 4:55–62. The firewall, an internal component, is distinct from the entire network or network locations. The Court also notes that Fortinet frames its argument based on "how a POSITA would understand the term 'shared network,'" Fortinet Br. at 8, but does not submit any evidence supporting its view of what a POSITA would understand.

The Court thus adopts Netskope's plain and ordinary meaning construction, which does

United States District Court
Northern District of California

not require the "shared network" to be a local network or limit access only to unauthenticated users.

**B. '710 Patent**

While the '336 Patent allowed a user to access the full internet after authentication through the network access controller, Walled Gardens in the '710 Patent confine a user's access to a specific region of the network. '710 Patent at 1:58–60. This invention may be employed when a client device is infected or a client's access needs to be restricted for other reasons, like to allow access to chosen content or to reduce risk of network infection. *Id.* at 1:47–54. Incoming network traffic is inspected at the network access gateway, which manages whether client devices are assigned to Walled Gardens, each of which are "allowed locations in an outside network." *Id.*, cl. 1.

**ii. "subordinate to" ('710 Patent, claims 1, 6, 8, 13, 15, 20)**

| Netskope's Proposed Construction | Fortinet's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

The parties dispute whether "subordinate to" is indefinite. Fortinet bears the burden of showing by clear and convincing evidence that the "claims, read in light of the specification . . . and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901; *BASF Corp.*, 875 F.3d at 1365.

The claims recite "restricting all network traffic emanating from the client device to . . . network destination addresses that are not in or subordinate to the first network segment." *See, e.g.,* '710 Patent, cl. 1. The specification describes two network segments that are subordinate. First, there is a segment that operates independently of the broader network infrastructure for the purpose of preserving network security. '710 Patent 3:48–55; 4:6–21. Second, the patent describes a scenario where a client is infected and quarantined to a restricted walled garden. *Id.* at 5:54–6:7.

Fortinet argues that the terms "in" and "subordinate to" must have distinct meanings, and that otherwise "subordinate to" would be indefinite. Fortinet Br. at 13–14. It then argues that since there is no network segment that is "external" but also "subordinate to the first network

segment," a POSITA could not determine the meaning of the contested term. *Id.* Netskope counters that this argument does not align with the plain meaning of the patent, because "not in or subordinate to" does not "require that a site be both external and subordinate to a walled garden." Reply. Br. at 9.

Netskope argues that the patent's illustration shows how Walled Gardens A and B may overlap at Site M, and be independent of Walled Garden C. '710 Patent, Fig. 1. Similarly, routing may occur to Site J, which lacks any administrative or network segment. *Id.* Netskope contends that these locations are not "subordinate to" the first network segment, and that sites located within Walled Garden C are not subordinate to Walled Gardens A or B. Netskope Br. at 13. Further, it argues that the plain claim language does not require that a site be both external and subordinate to a walled garden to provide meaning to "subordinate to." Reply Br. at 9 (quoting '710 Patent, claim 1 ("not in or subordinate to the first network segment")). Fortinet counters that since Site "J" is external to all Walled Gardens, it is neither "in" nor "subordinate to" any network segment. Fortinet Br. at 14.




*FIG. 1*

Netskope further presents evidence that a POSITA would understand the meaning of "subordinate to" in this context. Its expert explained that a POSITA would understand that "a network segment may be considered subordinate if it operates within the administrative, routing, or policy domain of another segment—regardless of physical or topological configuration." Dkt.

No. 123-5 ¶ 44. Fortinet responds to this argument by pointing out that the expert admitted that there is not a common definition of "subordinate to" without additional context, Fortinet Br. at 14–15, then notes that the patent does not mention any "administrative, routing, or policy domain" related to a subordinate segment. *Id.* at 15.

The Federal Circuit has held that when written descriptions include examples and procedures that provide guidance and points of comparison to skilled artisans, a claim is not indefinite. *See Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370-1378–79 (Fed. Cir. 2017); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332, 1355–36 (Fed. Cir. 2010). "[A] claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions." *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015).

The Court finds that the written descriptions and examples provide a POSITA sufficient guidance to ascribe meaning to "subordinate to." First, the overall purpose of the patent is to assign devices to network locations that are independent of broader infrastructure for various purposes. *See, e.g.,* '710 Patent at 3:48–55, 4:6–21). This can be accomplished with separate walled gardens for traffic control or quarantining purposes. *Id.*

The Court further finds the full phrase at issue, which indicates that "all network traffic" is "restrict[ed]" to destinations "that are not in or subordinate to the first network segment," is not ambiguous. Fortinet did not dispute Netskope's representation that the "first network segment" could be a walled garden from figure 1. Hr'g Tr. at 27:24–34:11. By showing the redirection of traffic to Site "S" in Walled Garden "C" as opposed to Sites "K," "M," "P," or "J," figure 1 supplements the claim's language to provide sufficient guidance to a POSITA of its meaning.

The Court also finds that Netskope provides evidence of what a POSITA would understand the disputed term to mean in the context of the '710 Patent. Fortinet's contention that the expert's concession that "subordinate to" depends on context fails to provide affirmative clear and convincing evidence of indefiniteness.[2] The Court thus adopts a construction of plain and

[2] Fortinet further conceded at the claim construction hearing that it had no evidence of what a POSITA would understand the disputed term to mean other than "the patent itself." Hr'g Tr. at

ordinary meaning, which is not indefinite.

## C. ’426 Patent

The ’426 Patent describes an invention for a single sign-on proxy service where a user authenticates to an identity service, and that service then sends an authentication request to another identity service such that the user is authenticated for both services. ’426 Patent at 1:11–55. That other identity service may be proxied to a separate external service of the user. *Id.* at 3:17–21, 3:54–61. The patent provides the example of a user who seeks to buy a product from a vendor using their bank, but if the vendor and bank are not designed to interact with each other, the transaction will fail or the user will have to authenticate with both services separately. *Id.* at 1:22–37. The patent claims a technique to permit the user to achieve a single sign-on where the transaction includes proxying of services. *Id.*, cl. 1.

### iii. “proxy for access sessions to other services” (’426 Patent, claim 1)

| Netskope’s Proposed Construction | Fortinet’s Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | “proxy for all communications to the other services” |

The parties dispute whether “access sessions” must include “all communications” between the principal and the other external service after authentication.

Fortinet argues that the structure of the claim language shows that the proxying continues for “all communications” with the other services after the authentication has occurred. It contends that the claim establishes a first step for “authentication,” then a second for proxying access to other content for the principal. Fortinet Br. at 16. Fortinet’s proposed construction would require the proxy to handle every packet once the session is established with the other service. Fortinet Br. at 17 (citing Dkt. No. 130-3 at 9).

Netskope asks the Court to adopt a plain and ordinary meaning construction. It argues that such a construction permits packets to be sent through the proxy after authentication, but does not require that every communication is proxied. Netskope Br. at 14–16. For example, the claim

---

34:2–6.

United States District Court
Northern District of California

language does not exclude the possibility that the session can be handed off or that the principal communicates with the other service outside of the proxy. Netskope Br. at 15; Reply Br. at 10. It suggests that the proxy mediates "session-level authentication" and "access control between a principal and the external services." *Id.* at 15–16.

The intrinsic evidence shows that proxying does not occur only for authentication. The claim recites two steps, as Fortinet explained in its brief and Netskope does not contest. '426 Patent, cl. 1; Fortinet Br. at 17; Reply Br. at 10. The proxy first authenticates the user, then "access sessions occur indirectly through the identity service" showing that packets may be sent through the proxy. '426 Patent, cl 1. But "all communications" as a replacement for "access sessions" would read the phrase too broadly. And Netskope is right that nothing in the patent indicates that "all communications" with the external service must be conveyed through the proxy. The patent does not exclude the possibility that some data packets are communicated outside of the proxy or are handed off. Netskope Br. at 15.

The Court adopts a construction that neither party proposed to resolve the dispute presented. *O2 Micro*, 521 F.3d at 1361. The Court construes the term as "proxy for access session to other services where the proxy serves as the exclusive or non-exclusive means of communication to other services."

**iv. "principal believing interactions are with the external service" ('426 Patent, claim 1)**

| Netskope's Proposed Construction | Fortinet's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Indefinite. |

The parties dispute whether "principal believing" is indefinite. Fortinet bears the burden of proof and presents two arguments in support. Fortinet first contends that the patent does not provide reasonable guidance regarding the identity of the principal and how that principal could hold a "belief." Fortinet Br. at 18. Fortinet further suggests that the claim contains two limitations: a "transparently" limitation and a "believing" limitation, which are contradictory if both have a plain and ordinary meaning construction. Fortinet Br. at 18–19.

Fortinet first argues that the claim is indefinite because it is not clear whether the

"principal" is the end user or a machine. *Id.* at 18. If the principal is a human, Fortinet questions how a POSITA reading the patent could determine whether the principal "believes" something. If the principal is a machine, Fortinet questions how it could subjectively believe something. *Id.* at 18. Fortinet contends that this ambiguity makes the term indefinite. *Id.* at 18. Netskope counters that Fortinet does not meet the high bar for showing indefiniteness. Netskope Br. at 11. First, the patentee defined "principal" as "another type of resource that may be an automated service or may logically represent a physical resource within an electronic environment, such as, but not limited to, a user, a device, a group of users, a group of devices, an object, etc." '426 Patent at 2:28–32. Netskope submits that a POSITA would further understand that "principal" is "commonly used" in authentication systems, Dkt. No. 123-5 ¶ 55, such that when the principal "believes" it is interacting with an external service when the requests "are processed as though it is interfacing directly with the external service." Netskope Br. at 11–12 (citing '426 Patent at 3:62–65, 4:4–15, 4:25–29).

Fortinet next argues that the claim contains two contradictory limitations, the "transparently" limitation and the "believing" limitation. The "transparently" limitation recites that "the principal's access sessions occur indirectly through the identity service and transparently to the principal." '426 Patent, cl 1. Fortinet contends this is inconsistent with the principal's belief that it is interacting with the external service (the "believing limitation"), since one cannot both "believe" it is interacting with the external service while "transparently" interacting with the access service. Fortinet Br. at 18. Netskope suggests that the "transparently limitation" refers to how access is routed, while the "believing limitation" describes how the interaction is perceived by the principal. Netskope Br. at 17–18. Therefore, Netskope argues that the two limitations are not inconsistent. *Id.*

The Court adopts Netskope's construction. Fortinet's objections, which are based on counsel's view of the commonly understood meaning of the claim terms, do not show by clear and convincing evidence that a POSITA would not understand the patent's claim given the context. Fortinet Br. at 17–19; *BASF Corp.*, 845 F.3d at 1365. Fortinet's argument regarding the principal fails because the patentee set forth its own definition of "principal." '426 Patent at 2:28–32. Its

argument regarding the believing limitation is unpersuasive because it did not adduce any evidence that a POSITA would not understand the term. Netskope's expert explains that a POSITA would understand that "believing" imparts information about how the interaction is perceived on the identity level. *See* Dkt. No. 123-5 ¶ 59.

The plain and ordinary meaning of the claim, viewed in light of the context of the patent and its embodiments, provides a POSITA with sufficient information to establish reasonable certainty as to the meaning of the claimed invention. The Court adopts a plain and ordinary meaning construction, which is not indefinite.

**D. '936 Patent**

The '936 Patent describes a system and method for automated computer support. In this process, the Agent component takes a "snapshot" of a machine by examining certain files. '936 Patent at 5:37–48. The Agent then compresses that snapshot and sends it to a "Collector component" to parse and store. *Id.* at 5:1–3. A third component, the Analytic component, extracts that data and analyzes it against a model that reflects a machine in a "normal state," then identifies any anomalies. *Id.* at 5:4–15; *see also id.*, cl 1 ("[a] method of detecting abnormal system states in computers, comprising: receiving snapshots from a plurality of computers within a population of computers, wherein individual snapshots include data indicating a state of a respective computer. . . ."). Dependent claim 7 provides that the snapshots from claim 1"include data associated with at least one of: system files, application files, a registry entry, a performance counter, a process, a communication port, a hardware configuration, a log file, a running fast, services, and network connections." *Id.* at 24:2–5.

**v. "snapshots" ('936 Patent, claims 1, 7–8, 12, 21–22)**

| Netskope's Proposed Construction | Fortinet's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "the state of a machine based on an examination of all system files, designated application files, the registry, performance counters, processes, services, communication ports, hardware configuration, and log files at a given point in time" |

The parties dispute whether a "snapshot" must be based on the examination of a specific

list of files at any given time. The parties' dispute centers on the description of two figures in the specification. The description of figure 1, an exemplary embodiment, indicates that the Agent component takes a detailed snapshot of the state of the machine which includes "a detailed examination of all system files, designated application files, the registry, performance counters, processes, services, communication ports, hardware configuration, and log files." '936 Patent at 5:41–48. In discussing figure 2, the specification adds that the scan conducted by the Agent component may have some variability: it may read every byte and create a hash for each file (rather than only reading metadata), or the scan may only log changes from the last scan. *Id.* at 6:33–50. The scans may also occur periodically or on-demand, and take anywhere from a few minutes to hours to execute. *Id.* at 6:33–50, 8:67–9:5.

Fortinet argues that the patentee defined "snapshot" in figure 1. *See* Fortinet Br. at 20 (citing '936 Patent at 5:39–48, 6:26–32). Fortinet further argues that its construction does not mandate that all data enumerated in the patent is captured in a snapshot, only that all of the data it lists is examined. Fortinet Br. at 20 (quoting '936 Patent at 5:39–48; 6:26–32); Fortinet Br. at 22. In support of its construction, Fortinet also presents three technical definitions that it argues "confirm that 'snapshot' was commonly understood in the art to refer to the state of a machine at a given point in time." Fortinet Br. at 20.

Netskope suggests that the claim recites a broader definition: "snapshots include data indicating a state of a respective computer." Reply Br. at 13 (quoting '936 Patent, cl. 1). Netskope contends that "snapshot" should be understood within the context of that phrase and be given its plain and ordinary meaning. *Id.* Further, Netskope suggests that the patent in figure 2 recognizes variability in what constitutes a "snapshot," Netskope Br. at 21, and argues that the Court should not adopt a construction that narrows the claims based on an exemplary embodiment. Reply Br. at 13–14.[3] Netskope also observes that the technical definitions that Fortinet presents

[3] Netskope also argues that Fortinet's construction makes claim 7 superfluous. Claim 7 requires that a snapshot from claim 1 contain at least one of certain data types. '936 Patent, cl. 7. The Court does not find either party's argument on this point convincing. The snapshot must contain some data, even if it is only notating changes from the last examination, so the fact that the snapshot contains only one file type from the enumerated list does not change the analysis. The snapshot must contain data from one of the sources. But there is no requirement in claim 7 that all of those

United States District Court
Northern District of California

do not support its proposed limitations. Netskope Br. at 22.

The Court adopts Netskope's construction. The language of the claim does not support the narrow limitation that Fortinet seeks to impose. Rather, the patent indicates that the examination of files includes data "indicating a state of a respective computer." '936 Patent, cl. 1. While the Agent component "takes" the snapshot by examining a larger list of components, there is flexibility in what is examined. *See id.*, cl. 7 & at 6:26–33, 6:44–46, 8:67–9:5. The patentee did not define snapshot, as Fortinet claims, and none of the evidence submitted by Fortinet supports the conclusion that a POSITA would understand that a "snapshot" requires all of the nine file types.[4]

**E. '153 Patent**

The '153 Patent claims a system and method for identifying users who share the same internet access point, like a public Wi-Fi, and allocating them bandwidth limitations. '153 Patent at 1:21–2:10.

**vi. "arbitrary number of attributes" ('153 Patent, claims 1, 10, 15)**

| Netskope's Proposed Construction | Fortinet's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

The parties dispute whether the patent provides sufficient guidance for a POSITA to understand "arbitrary number of attributes."

Netskope argues that the '153 Patent uses attributes within a user's profile to determine bandwidth limitations, but the number of those attributes can vary from user to user. Reply Br. at 15 (citing '153 Patent 2:36–38). Netskope's expert explains that "each user profile is assigned a traffic rule—regardless of how many attributes are defaulted. As a result, the number and types of

file types *must be* examined or that *only* those file types are examined.

[4] For the first time at the claim construction hearing, Fortinet indicated it would accept a construction in which a "'snapshot' . . . identifies or reflects the state of a machine as a whole at a given point in time." Hr'g Tr. at 61:10–13. While this appears to more closely track the intent of the patentee, Fortinet's argument requires the Court to interpret "snapshot" to reflect an adaptive reference model of the entire machine. Hr'g Tr. at 61–64. While the exemplary embodiments provide that the base snapshots may comprise the "complete state of the machine" or be "detailed," that does not require every embodiment to contain the same limitation. '936 Patent at 5:37–48, 17:52–64.

attributes used to determine each user's bandwidth may differ." Dkt. No. 123-5 ¶ 89. Netskope contends that a POSITA reading the patent would understand that this means there is an "arbitrary" number of attributes. Reply Br. at 16. Fortinet argues that Netskope's and a plain and ordinary meaning construction equates "arbitrary" with "variable" and "different," which have distinct meanings. Fortinet Br. at 25. And while the patent discloses that "each user profile can have a predefined set of attributes" and "[i]n some cases, the . . . profile may not provide values for each of those attributes," Fortinet argues that the "set of attributes" should not be understood as the same as the "arbitrary number of attributes." Fortinet Br. at 24 (quoting '153 Patent at 5:34–37). Fortinet further suggests that Netskope's expert "offers no affirmative stance on the plain and ordinary meaning of an 'arbitrary number of attributes'" such that the expert does not clarify what a POSITA would understand. *Id.* at 25 (citing Dkt. No. 123-5 ¶ 87).

The Court adopts a plain and ordinary meaning construction, which is not indefinite. Netskope presents evidence of how a POSITA would understand "arbitrary" in the context of the patent, Dkt. No. 123-5 ¶ 87–90, and that position is supported by the embodiments and specification. *See, e.g.,* '153 Patent at 2:36-38, 2:44-60, 5:34–43. Fortinet identifies some differences between "arbitrary" and its chosen synonyms, but even if those synonyms might arguably better reflect the patentee's intent, the patentee is not required to set forth terms with "absolute or mathematical precision." *BASF Corp.*, 875 F.3d at 1365 (quoting *Biosig Instruments*, 783 F.3d at 1381). The intrinsic evidence provides sufficient examples and language to permit a POSITA to determine the scope of the claim with reasonable certainty. *Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

**F. '697 Patent**

The '697 Patent claims a method and system for identifying a specific device based on its operating system. Typically, all users who share a router or gateway share an IP address, even if multiple users are connected because internet service providers only provide one wide area network address for each premises. '697 Patent at 1:30–34. When one of those connected computers is infected with malware, a service provider network is unable to determine which device is infected and what remediation procedures are appropriate, because it cannot identify

which traffic is emanating from the infected device. *Id.* at 1:43–45. The '697 Patent claims a solution in which the service provider network can identify devices using a malware ID and the operating system identifier associated with the session that generated an alert. *See id.*, cl. 1.

**vii. "generating an alert" ('697 Patent, claims 1, 15, 24)**

| Netskope's Proposed Construction | Fortinet's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "[generating] a notification sent by a network sensor"[5] |

The parties' primary dispute is whether the alert must be sent by a network sensor.[6] Fortinet presents two arguments in favor of imposing that limitation. First, it suggests that the independent claims in the '697 Patent all "effectively recit[e] the same functions," with claim 1 describing the method, claim 15 describing the apparatus, and claim 24 describing the computer-readable storage. Hr'g Tr. at 84:1–10; *see also* Fortinet Br. at 27 (describing how claims 1 and 15 should be read consistently). According to Fortinet, this means that the limitation that "the network sensors" "generat[e] an alert" from independent claim 15 must also apply to independent claims 1 and 24, which do not contain that limitation. Fortinet Br. at 28 (citing '697 Patent, cl. 15). Netskope responds that claims 1 and 24 do not identify the source of the notification, and that it would be improper to import a limitation from one claim into others. Reply Br. at 17 (citing *Phillips*, 415 F.3d at 1314–15).

Second, Fortinet suggests that the specification repeatedly discloses that the network sensor generates the alert, '697 Patent 4:60–5:2, 5:19–21, 7:63–67, such that a POSITA could only conclude that the limitation applies to all independent claims. Fortinet Br. at 27 (citing *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136–37 (Fed. Cir. 2016)); *Phillips*, 415 F.3d at 1316 ("the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the

[5] Fortinet appears to concede that its proposed construction should be modified since its proposal changed an action ("generating") into an object ("a notification"). Fortinet Br. at 27. The Court assesses the proposed construction on that basis.

[6] Netskope suggests that Fortinet seeks to change "alert" into "notification" without explanation, and Fortinet argues that "an alert is a notification." Fortinet Br. at 27 (internal quotes omitted). The Court will not adopt a construction that replaces the patentee's chosen term with Fortinet's chosen synonym.

inventor"); *MyMail, Ltd. v. IAC Search & Media, Inc.*, No. 17-cv-4488-LHK, 2020 WL 1043659, at *9 (N.D. Cal. March 4, 2020) ("The Federal Circuit has held that such consistency in a specifications' [sic] embodiments and disclosures weigh in favor of treating the specifications as definitional and limiting the scope of a term."). Netskope argues that the specification should not be construed as limiting since some embodiments do not specify that the network sensor generates the alert, '697 Patent at 3:28–36, 3:48–4:9, 4:37–41, 5:63–6:13, and contends that even "the description of a preferred embodiment should not be imported into the invention as a whole." *Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008); *see also* Reply Br. at 17 (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). Netskope suggests that because only one embodiment contains the limitation, the patent otherwise "leaves open [] what can actually generate that alert." Hr'g Tr. at 76:6–25.

When courts construe patent claims, "[s]pecifications teach. Claims claim." *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1121 (Fed. Cir.1985) (en banc). "[T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor," *Phillips,* 415 F.3d at 1316, but "the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Poly-America*, 839 F.3d at 1136. A single embodiment, even a preferred embodiment, does not determine the scope of a claim. *Rexnord Corp.*, 274 F.3d at 1345. The claims determine the scope of the invention, and patentees are "not required to describe in the specification every conceivable and possible future embodiment of his invention." *Id.* The Federal Circuit has found a limiting disavowal of claim scope where the specification states that the embodiment represents "the present invention," *Poly-America,* 839 F.3d at 1136, the patentee makes explicit statements denigrating an alternative, *Honeywell Intern., Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319–20 (Fed. Cir. 2006), or the prosecution history reflects that the patentee differentiated the present invention from prior art by narrowing the scope of the claim, *Poly-America*, 839 at 1136.

The Court finds that there is not clear and unequivocal evidence here that the patentee disavowed a claim scope that would cover alerts sent by something other than the network sensor. The specification explains that the "[v]arious embodiments" are provided "by way of example

United States District Court
Northern District of California

only." '697 Patent at 2:51–52, 3:6–7. References to the exemplary nature of the embodiments appear throughout the patent. *See, e.g., id.* at 5:42–62 (using "for example" three times in discussing an embodiment). The patent also does not indicate that "the present invention" must have a certain feature. *See Poly-America*, 839 F.3d at 1136. And Fortinet does not point to anything in the specification or prosecution history suggesting that the patentee otherwise disclaimed the full scope of the term by either denigrating an alternative or differentiating the present invention from prior art. Netskope also submits, without rebuttal from Fortinet, that Fortinet's IPR petition similarly never suggested that its current construction (or any construction) was necessary. *See* Hr'g Tr. at 80:10–81:3. On this record, the Court thus does not find that the patentee clearly disavowed the full scope of the claim.

Fortinet's arguments to the contrary are not persuasive. Fortinet focuses on embodiments in which the patentee stated that the network sensor generates an alert, which is consistent with claim 15. Fortinet Br. at 27 (citing '697 Patent 4:60–5:2, 5:19–21, 7:63–67). But Netskope is right that, absent some clear and unambiguous disavowal, those embodiments cannot justify importing that limitation into claims 1 and 24 when those claims say nothing about what generates the alert. '697 Patent at 2:16–18, 3:28–36, 3:48–4:9, 4:37–41, 5:63–6:13; *see Rexnord*, 274 F.3d at 1344. And this is true whether or not the three claims could at some level be characterized as "reciting the same functions."

The Court adopts a plain and ordinary meaning construction.

**viii. "service provider network" ('697 Patent, claims 1, 15, 24–25)**

| Netskope's Proposed Construction | Fortinet's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "internet service provider network" |

The parties dispute whether a "service provider network" must be an internet service provider. Netskope contends that the plain and ordinary meaning of "service provider network" is sufficient to identify the patentee's intended scope. Netskope Br. at 27–28. It points out that the patent refers to an internet service provider only once and distinguishes it from a service provider. Netskope Br. at 28 (quoting '697 Patent at 4:11–16) ("A user location 100 comprises multiple computing devices 104, 106, 108 in a local area network (LAN) that access an *Internet service*

*provider or service provider (SP) network* 100 via an access device 102") (emphasis added). Fortinet does not attempt to address the patent's clear distinction. Fortinet Br. at 28–29.

Fortinet's primary argument for its construction is that the "service provider network" unambiguously provides access to the internet, '697 Patent, fig. 1, and the problem the patent seeks to solve is specific to internet service providers. Fortinet Br. at 28–29. But Fortinet's argument that that only ISPs use a modem or router is inconsistent with the patent's specification, as Netskope points out. Reply Br. at 18 (citing '697 Patent at 1:30-34). Further, internet service provider refers to a specific type of entity, and there is no basis to limit the scope of the invention in the way Fortinet asserts. Netskope Br. at 28.

The Court adopts a construction of plain and ordinary meaning, which is not required to be an "internet service provider network."

## IV. CONCLUSION

The Court construes the claim terms as follows:

| Claim Term | Adopted Construction |
|---|---|
| "shared network" ('336 Patent, claims 1–2, 4, 6–9, 11 13–17, 20) | Plain and ordinary meaning construction, which does not require the "shared network" to be a local network or limit access only to unauthenticated users. |
| "subordinate to" ('710 Patent, claims 1, 6, 8, 13, 15, 20) | Plain and ordinary meaning, which is not indefinite. |
| "proxy for access sessions to the other services" ('426 Patent, claim 1) | "proxy for access session to other services where the proxy serves as the exclusive or non-exclusive means of communication to other services" |
| "principal believing interactions are with the external service" ('426 Patent, claim 1) | Plain and ordinary meaning, which is not indefinite. |
| "snapshots" ('936 Patent, claims 1, 7–8, 12, 21–22) | Plain and ordinary meaning. |
| "arbitrary number of attributes" ('153 Patent, claims 1, 10, 15) | Plain and ordinary meaning, which is not indefinite. |
| "generating an alert" ('697 Patent, claims 1, 15, 24) | Plain and ordinary meaning. |

| | |
|---|---|
| "service provider network" ('697 Patent, claims 1, 15, 24–25) | Plain and ordinary meaning, which is not required to be an "internet service provider network." |

The Court further **SETS** a telephonic case management conference on October 20, 2026, at 2:00 p.m. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The Court further **DIRECTS** the parties to meet and confer and submit a joint case management statement by October 13, 2026.

**IT IS SO ORDERED.**

Dated: September 24, 2026

Haywood S. Gilliam, Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California